**WASHINGTON PHYSICIANS SERVICE ASSOCIATION; Medical Service Corporation of Eastern Washington, a health care service contractor; Good Health Plan of Washington, a health maintenance organization; Pacificare of Washington, a health care service contractor; Selectcare Health Plans, a health maintenance; Qualmed Washington Health Plan, Inc., a health maintenance; Kaiser Foundation Health Plan of the Northwest, a health maintenance organization; Blue Cross and Blue Shield of Oregon, a health care service contractor; Group Health Cooperative of Puget Sound, a health maintenance organization; Blue Cross of Washington and Alaska, a health care service; Pierce**

County Medical Bureau, Inc., a health care service; King County Medical Blue Shield, a health care service, Plaintiffs–Appellees,

v.

Christine O. GREGOIRE, in her official capacity as Attorney General for the State of Washington; Deborah Senn, in her official capacity as Insurance Commissioner of the State of Washington, Defendants–Appellants.

No. 97–35536.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 7, 1998.

Decided June 18, 1998.

As Amended on Denial of Rehearing
and Suggestion for Rehearing
En Banc Aug. 24, 1998.

Christine O. Gregoire, Attorney General of Washington, H. Lee Roussel, Assistant Attorney General, Olympia, WA, for defendants-appellants.

Richard J. Birmingham, Birmingham Thorson & Barnett, P.C., Seattle, WA, for plaintiffs-appellees.

Paul C. Adair, United States Department of Labor, Office of the Solicitor, Washington, DC, for amicus curiae United States Secretary of Labor.

Arthur N. Lerner, Michaels Wishner & Bonner, P.C., Washington, DC, for amicus curiae American Association of Health Plans, Inc.

Jonathan P. Meier, Sirianni & Youtz, Seattle, WA, for amici curiae Washington Association of Naturopathic Physicians and Washington State Chiropractic Association.

Gregory B. Stites, Kansas City, MO, for amicus curiae National Association of Insurance Commissioners.

Before: THOMPSON and TASHIMA, Circuit Judges, and STAGG, District Judge.*

TASHIMA, Circuit Judge.

More than a decade ago, the Supreme Court acknowledged the growing trend among the states to require health insurers to offer certain benefits as part of every health insurance policy they sell. *See Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 728–29, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). In *Metropolitan Life*, the Court upheld Massachusetts' once-controversial requirement that insurers offer some limited form of mental-health protection. That trend continues and continues to generate controversy. In this case, we must decide whether Washington's so-called Alternative Provider Statute is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* The Alternative Provider Statute, or "every category of provider" law, requires that health maintenance organizations ("HMOs") and health care service contractors ("HCSCs") cover acupuncture, massage therapy, naturopathy, chiropractic services, and a

variety of other "alternative" medical treatments. We conclude that the Washington law is merely the latest variation in an oft-repeated theme, and we reject ERISA preemption.

## I.

In 1995, the Washington legislature effected sweeping changes to the state's regulation of health insurance, and the Alternative Provider Statute (the "Act") is one part of that reform. The Act itself is relatively short:

Every health plan delivered, issued for delivery, or renewed by a health carrier on and after January 1, 1996, shall:

(1) Permit every category of health care provider to provide health services or care for conditions included in the basic health plan services to the extent that:

(a) The provision of such health services or care is within the health care providers' permitted scope of practice; and

(b) The providers agree to abide by standards related to:

(i) Provision, utilization review, and cost containment of health services;

(ii) Management and administrative procedures; and

(iii) Provision of cost-effective and clinically efficacious health services.

RCW 48.43.045(1).

The terms used in the Act are mostly defined in RCW 48.43.005 ("Definitions"). In particular, a "health carrier" or "carrier" means a disability insurer, a health care service contractor, or a health maintenance organization. RCW 48.43.005(8). And a "health plan" or "health benefit plan" means "any policy, contract, or agreement offered by a health carrier to provide, arrange, reimburse, or pay for health care service," subject to a few exceptions. RCW 48.43.005(9). "Provider" is undefined in the statute, but refers to a doctor, dentist, acupuncturist, or other health care provider.

Thus, the Act forces every carrier (HMOs, disability insurers) to allow every insured to choose from an expanded list of providers (acupuncturists, massage therapists) for medical conditions covered by the insured's policy. The Act does not force any carrier to contract with any particular provider (*e.g.*, John Smith, M.D.) but merely forbids a carri-

---

* The Honorable Tom Stagg, Senior United States District Judge for the Western District of Louisi- ana, sitting by designation.

er from excluding an entire category of licensed providers (*e.g.,* all chiropractors or all naturopaths) from its policy.

The plaintiffs, a collection of HMOs and HCSCs, sought a declaratory judgment that the Act is preempted by ERISA and an injunction against its further enforcement. On cross motions for summary judgment, the district court ruled for the plaintiffs, finding that the Act "relates to" an employee benefit plan under ERISA, and that it is not saved as a regulation of insurance. *Washington Physicians Serv. Ass'n v. Gregoire,* 967 F.Supp. 424, 427–31 (W.D.Wash.1997). The state appeals, and we reverse.

## II.

ERISA provides for the federal regulation of employee welfare benefit plans. *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 650–51, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). To ensure that such regulation would remain "exclusively a federal concern," *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981), Congress enacted a broad preemption provision, which states that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.…" 29 U.S.C. § 1144(a). An exception is contained in 29 U.S.C. § 1144(b)(2)(A): "[N]othing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities."

Thus, our ERISA inquiry is a two-step process. We first ask whether the Act "relates to" an employee benefit plan; and if it does, we then decide whether it is exempted from preemption by the savings clause in § 1144(b)(2)(A). We conclude that the Act escapes ERISA preemption at the first step, but since we also think it would be saved as a regulation of insurance, we explain the second step as well.

### A. Relates To

In *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), the Supreme Court explained that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Id.* at 96–97, 103 S.Ct. 2890. The Court has since elaborated that in determining whether a "connection" exists between a state law and an ERISA plan, courts must consider whether the law requires particular benefit structures or imposes administrative burdens on a plan. *Travelers,* 514 U.S. at 658, 115 S.Ct. 1671. A law does not "relate to" an ERISA plan merely because it produces indirect economic effects that happen to influence the shopping choices that the benefit plan must make. *Id.* at 661, 115 S.Ct. 1671. Rather, a generally applicable state law that does not specifically target ERISA plans is preempted only if it produces such acute economic effects "as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers.…" *Id.* at 668, 115 S.Ct. 1671.

We can dispense with the most obvious way in which the Washington law might "relate to" an employee benefit plan, namely, by referring to and acting directly upon such plans. The statute operates directly upon "health plans," but it also makes clear that this term refers to the plan offered by the health carrier (*e.g.,* an HMO), not the benefit plan offered by the employer. RCW 48.43.005(9)(i). Further narrowing the law's application is the definition of a "health carrier" to include only a disability insurer, an HCSC or an HMO, and to *exclude* employer-sponsored, self-funded health plans. RCW 48.43.005(9). In plain English, if an HMO wants to sell health insurance in Washington, it must comply with the Act regardless of to whom it sells insurance. Thus, if ABC Corp. wishes to offer its employees health insurance by purchasing an HMO plan, it will find that all of the options available to it in the market cover alternative medicine because it is simply not legal for an HMO to offer any other kind of plan. By contrast, if ABC Corp. were itself the health self-insurer for its employees, the Act would not apply at all, and ABC Corp. could structure its benefits in any way it chose. Accordingly, the Act does not operate directly on the ERISA plan, but only indirectly by limiting the options available in the market—if the plan should choose to purchase health insurance on the market, rather than providing it itself or not providing it at all.

Arguably, there is a textual ambiguity in the Act about whether its definition of "health plan" inadvertently includes some

specialized kinds of ERISA plans. We say "inadvertently" because the exclusion of self-funded plans in RCW 48.43.005(9)(i) is quite obviously intended to save the Act from ERISA preemption. Notwithstanding this exclusion, the plaintiffs argue that the Washington legislature was not careful enough in drafting the law, and they assert that the Act does operate directly upon some kinds of ERISA plans—in particular, contracts for administrative services performed for a self-insured employer, multiple-employer and or-ganization-sponsored plans, and self-funded Taft–Hartley plans.

We are unpersuaded by the plaintiffs' broad reading of the Act. A health carrier's contract to perform only administrative ser-vices for a self-insured employer is not within the ambit of the Act. A "health plan" is defined as "any policy, contract, or agree-ment offered by a health carrier to provide, arrange, reimburse, or pay for health care service." RCW 48.43.005(9). A health carri-er that merely performs administrative func-tions for a self-insured employer clearly does not "provide," "reimburse," or "pay" for health care service. Possibly it "arrange[s] ... for health care service" by performing purely administrative tasks—but when a vague word such as "arrange" is placed next to "provide," "reimburse," and "pay," we think a more active involvement in the actual provision of health care is meant. Similarly, we are inclined to read the exclusion in RCW 48.43.005(9)(i) broadly to exclude self-funded Taft–Hartley plans, multiple-employer plans and organization-sponsored plans. Accord-ingly, we conclude that the Act does not operate directly on any ERISA plans.

With this reading of the Act, the instant case is easily distinguished from the numer-ous cases that have found a "reference" to ERISA plans in a state's regulation of health plans. In general, the state laws in these other cases all included ERISA plans in the definition of "health plan" or otherwise ex-pressly referred to ERISA plans. See FMC Corp. v. Holliday, 498 U.S. 52, 59, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990); Metropolitan Life, 471 U.S. at n. 11, 105 S.Ct. 2380; Texas Pharmacy Ass'n v. Prudential Ins. Co., 105 F.3d 1035, 1038 (5th Cir.), cert. denied, — U.S. —, 118 S.Ct. 75, 139 L.Ed.2d 34 (1997); CIGNA Healthplan of La., Inc. v. Louisiana, 82 F.3d 642, 647 (5th Cir.), cert. denied, — U.S. —, 117 S.Ct. 387, 136 L.Ed.2d 304 (1996). See also Blue Cross and Blue Shield v. Nielsen, 917 F.Supp. 1532, 1537 (N.D.Ala.1996), questions certified, 116 F.3d 1406 (11th Cir.1997); Hayden v. Blue Cross and Blue Shield, 843 F.Supp. 1427, 1428 n. 2, 1433 (M.D.Ala.1994); General Mo-tors Corp. v. Caldwell, 647 F.Supp. 585, 586 (N.D.Ga.1986);[1] Blue Cross and Blue Shield v. Peacock's Apothecary, Inc., 567 F.Supp. 1258, 1264 (N.D.Ala.1983). Because the Act is different from these other state laws in that it does not expressly refer to ERISA plans and does not operate directly on them, we do not find this string of prece-dent relevant. We hold that the Act does not have a "reference" to ERISA plans.

We also do not find a "connection to" ERISA plans. The plaintiffs' argue that the Act is connected to ERISA plans because it supposedly affects the structure of these plans, imposes an administrative burden on them, and controls administrative choices about with whom to contract. The plaintiffs are correct that if the Act did these things, it would have a "connection" to ERISA plans. Travelers, 514 U.S. at 656–57, 115 S.Ct. 1671. The problem for the plaintiffs, however, is their inability to distinguish between the plan and the health carrier—a distinction that, as we have noted, is important in the Act. We read the Act to operate only on health carri-ers that are distinct from ERISA plans, and with such a reading, it is simply false to say that the Act imposes an administrative bur-den on the plan or that it dictates certain benefit structures. The Act does not require employers to provide any particular welfare benefit to employees, and it does not impose any burden on the plan in administering any benefits it chooses to provide. All of these burdens fall on the health carrier.

In the end, what saves the Act from ERISA preemption is that it does not have anything to do with employee benefit plans in particular. It is merely one of many state laws that regulates one of many products

---

1. In that case, although the court characterized the law as only indirectly affecting ERISA plans, General Motors, 647 F.Supp. at 587, it is clear from the court's summary of the statute that the law operated directly on ERISA plans. See id. at 586.

that an employee benefit plan might choose to buy. The Act regulates health insurance in a broad and neutral way, and *only* when that insurance is not provided by the plan itself. The mere fact that many ERISA plans choose to buy health insurance for their plan members does not cause a regulation of health insurance automatically to "relate to" an employee benefit plan—just as a plan's decision to buy an apple a day for every employee, or to offer employees a gym membership, does not cause all state regulation of apples and gyms to "relate to" employee benefit plans. After *Travelers*, ERISA plans no longer have a Midas touch that allows them to deregulate every product they choose to buy as part of their employee benefit plan. *See Travelers*, 514 U.S. at 661, 115 S.Ct. 1671 ("[N]othing in the language of the Act or the context of its passage indicates that Congress' chose to displace general health care regulation, which historically has been a matter of local concern....").[2] *See also De Buono v. NYSA–ILA Med. and Clinical Servs.*, —— U.S. ——, ——, 117 S.Ct. 1747, 1749, 138 L.Ed.2d 21 (1997) (holding that "hospitals operated by ERISA plans are subject to the same laws as other hospitals").

Accordingly, the mere fact that the Act regulates a product that ERISA plans often choose to buy does not mean that it "relates to" an ERISA plan. The district court erred in holding that the Act "relates to" ERISA benefit plans. *Washington Physicians Serv. Ass'n*, 967 F.Supp. at 427, 430.

## B. The Savings Clause

Alternatively, even were we to find that the Act "relate[d] to" an employee benefit plan, we would still reject ERISA preemption. 29 U.S.C. § 1144(b)(2)(A) saves from preemption state laws that regulate insurance. In our opinion, that is what the Act does.

In *Metropolitan Life*, the Court delineated the test for when a state law is saved as a regulation of insurance. First, the law must fit a common-sense understanding of insurance regulation. 471 U.S. at 740–42, 105

S.Ct. 2380. Second, the law must be within the business of insurance under the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–15. *Id.* at 740–44, 105 S.Ct. 2380. *See also Cisneros v. UNUM Life Ins. Co.*, 134 F.3d 939, 944–45 (9th Cir.1998) (summarizing the savings clause test).

### 1. Common Sense

■ In order to be within the common-sense definition of insurance regulation, "a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Beyond that, however, states have considerable latitude in regulating insurance. A state law that "is in reality a health law that merely operates on insurance contracts to accomplish its end," is perfectly permissible. *Metropolitan Life*, 471 U.S. at 741, 105 S.Ct. 2380. ERISA does not prefer traditional insurance regulations over innovative ones—all are equally saved from preemption. *Id.* Additionally, laws that require insurance companies to provide certain benefits as part of their insurance coverage are within the common-sense definition of insurance regulation. *Id.* at 742, 105 S.Ct. 2380.

■ The Washington law is "specifically directed" toward the insurance industry, *Pilot Life*, 481 U.S. at 50, 107 S.Ct. 1549, because it operates directly on HMOs and HCSCs, entities that are engaged in the business of health insurance. "The primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk." *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), citing 1 G. Couch, Cyclopedia of Insurance Law § 1:3 (2d ed. 1959) ("It is characteristic of insurance that a number of risks are accepted, some of which involve losses, and that such losses are spread over all the risks so as to enable the insurer to accept each risk at a slight fraction of the possible liability upon it."). The only distinction between an HMO (or HCSC) and a traditional insurer is that the HMO provides medical services directly,

2. Indeed, on remand, the Second Circuit, noting that the Supreme Court had restricted the scope of ERISA preemption in *Travelers*, repudiated its prior holdings that any law that targeted the health care industry automatically related to an ERISA plan. *Travelers Ins. Co. v. Pataki*, 63 F.3d 89, 94 (2d Cir.1995).

while a traditional insurer does so indirectly by paying for the service, *Anderson v. Humana, Inc.*, 24 F.3d 889, 890 (7th Cir.1994), but this is a distinction without a difference. *Metropolitan Life*, 471 U.S. at 741, 105 S.Ct. 2380 (explaining that nothing in ERISA "purports to distinguish between traditional and innovative insurance laws"); *Klamath–Lake Pharmaceutical Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1286–87 (9th Cir.1983). In the end, HMOs function the same way as a traditional health insurer: The policyholder pays a fee for a promise of medical services in the event that he should need them. It follows that HMOs (and HCSCs) are in the business of insurance.

Conceding that the Act regulates the correct entities, the plaintiffs nonetheless contend that it is not a regulation of insurance *per se*. In their view, the Act regulates the relationship between the carrier and the provider rather than the relationship between the carrier and the insured.

■■■ Because insurance is the business of spreading risk, *Royal Drug*, 440 U.S. at 205, 99 S.Ct. 1067, a state law that regulates the relationship between a carrier and a provider without affecting the risk borne by the insured is outside the definition of insurance regulation. *Id.* at 213–14, 99 S.Ct. 1067; *Hahn v. Oregon Physicians Serv.*, 689 F.2d 840, 843–44 (9th Cir.1982). On the other hand, a state law that mandates certain benefits in an insurance policy necessarily affects the risk borne by the insured and is within the definition of insurance regulation. *Metropolitan Life*, 471 U.S. at 743, 105 S.Ct. 2380; *Klamath–Lake*, 701 F.2d at 1286–87. The present case therefore turns on whether the Act confers a benefit on insureds (in the sense of affecting the risk the insured bears), or whether it merely regulates the carrier-provider relationship, a matter of indifference to the insured.

In our opinion, the Act confers a benefit on insureds by expanding the treatments that their health carriers must provide or pay for. Before the Act, if an insured had a medical condition that could not be effectively treated by traditional medicine (*e.g.*, lower back pain), but could be treated by alternative medicine (*e.g.*, by a chiropractor), the insured bore the risk that he would need this alternative medical treatment. Now, a substantial portion of Washington's population bears that risk because every health insurance policy must cover that alternative treatment. *Metropolitan Life*, 471 U.S. at 743, 105 S.Ct. 2380.

It is irrelevant that the Act accomplishes its risk-spreading function in an unusual way. Risk-spreading is a concept that involves more than the mere selection of certain medical conditions for coverage. The degree of risk-spreading between the insured and the carrier also depends on what kinds of treatments the policy agrees to pay for, what kinds of deductibles it will charge, and whether there will be a cap on overall expenses. *See Stuart Circle Hosp. Corp. v. Aetna Health Mgmt.*, 995 F.2d 500, 503 (4th Cir.1993) ("[T]reatment and cost are important components of health insurance.") A state law, for instance, that outlawed deductibles and co-payments would have a massive effect on risk-spreading, even though it did not alter the medical conditions covered by the policy. Similarly, a law such as the Act, that mandates expanded treatments for covered conditions also affects risk-spreading by shifting more risk to the insurer (*i.e.*, the risk that these treatments will be needed). Thus, despite the unusual form of the Act, it is emphatically a regulation of risk-spreading.

The plaintiffs focus too much on the phrasing of the Act in their effort to characterize it as affecting only the carrier-provider relationship, not the carrier-insured relationship. It is true that the Act says that every health plan must permit "every category of health provider to provide health services or care for conditions included in the basic health plan...." RCW 48.43.045(1). But the key word is "category," not "provider." The statute does not require any carrier to contract or deal with any particular provider; it merely forbids a carrier from excluding a complete *type* of provider. By contrast, the Act does require *every* health plan to let *every* insured make use of alternative medical treatments. Although this requirement confers a residual benefit on providers as a class, its primary benefit is to the insured. *See Stuart Circle*, 995 F.2d at 504 ("[A]lthough facially the statute only directly affects providers, it indirectly affects the insured's choice of provider and the consequent costs to the insured if he or she deems an excluded provider to be better qualified for treatment of a specific illness or accident. In

this way it affects the risk that an insured must bear.")

Another way to see how the Act confers a benefit on insureds is to contrast it with the "any willing provider" statutes that some states have enacted. An "any willing provider" law requires a health carrier to allow an insured to see any doctor willing to abide by the terms of the insurance plan and willing to provide only those treatments specified in the plan. Such a statute does not expand the conditions covered by the policy, *nor* does it expand the types of treatments available under the policy. *E.g., Texas Pharmacy,* 105 F.3d at 1041; *CIGNA,* 82 F.3d at 644 n. 2. Some courts have taken the view that an "any willing provider" statute does not affect the risk borne by the insured, reasoning that it merely regulates the carrier-provider relationship. *Prudential Ins. Co. v. National Park Med. Ctr., Inc.,* 964 F.Supp. 1285, 1298 (E.D.Ark.1997); *Nielsen,* 917 F.Supp. at 1541; *Hayden,* 843 F.Supp. at 1435–36. Other courts have disagreed and held that an "any willing provider" statute does spread risk. *See Texas Pharmacy,* 105 F.3d at 1041; *Stuart Circle,* 995 F.2d at 503; *Blue Cross and Blue Shield v. Bell,* 798 F.2d 1331, 1334–35 (10th Cir.1986). Regardless of the view one takes of an "any willing provider" statute (and we express no opinion on that), the Act even more clearly affects the carrier-insured relationship. The Act works a substantive alteration of the insurance policy and mandates that the insurer cover an expanded list of treatments. It therefore spreads the risk that an insured may need alternative medical treatments to heal his or her medical condition. Accordingly, the Act is within the common-sense definition of insurance. *Metropolitan Life,* 471 U.S. at 743, 105 S.Ct. 2380.

### 2. The McCarran–Ferguson Test

The second prong of the savings clause test is whether the law meets the McCarran–Ferguson test for the business of insurance. *Cisneros,* 134 F.3d at 944–47. There are three factors in the McCarran–Ferguson test: First, does the law spread risk? Second, does the law regulate an integral part of the policy relationship between the carrier and the insured? Third, is the law limited to entities within the insurance industry? *Id.* at 945 (quoting *Metropolitan*

*Life,* 471 U.S. at 743, 105 S.Ct. 2380). In this circuit, "the McCarran–Ferguson factors are simply relevant considerations or guideposts, not separate essential elements of a three-part test that must each be satisfied for a law to escape preemption." *Id.* at 946.

We face no new arguments here. We have already discussed the first factor, risk spreading, under the "common-sense" understanding of insurance. As to the second—whether the Act regulates an integral part of the carrier-insured policy relationship—we again refer to the previous section of the opinion. Because the Act does spread risk and therefore does confer a benefit on insureds, it does regulate an integral part of the carrier-insured relationship. *Metropolitan Life,* 471 U.S. at 743, 105 S.Ct. 2380.

The third prong—whether the Act is limited to entities within the insurance industry— once again takes us back to whether the Act reaches some self-insured ERISA plans, which by definition are not within the insurance industry. 29 U.S.C. § 1144(b)(2)(B). As we have already stated, we think it does not.

Accordingly, the Act satisfies all three prongs of the McCarran–Ferguson test and falls within the savings clause as a regulation of insurance. The district court erred when it held to the contrary. *Washington Physicians Serv. Ass'n,* 967 F.Supp. 427–31.

### III.

Having rejected ERISA preemption in this case, we now address the plaintiffs' alternative argument that construing the Act in the way that we have renders it invalid under RCW 48.47.005–.030 (formerly codified at RCW 48.42.060–.080). Those provisions require that any person seeking to establish a mandated health benefit law in Washington must provide the state legislature with a report addressing the social and fiscal impact of the proposed mandated benefit. RCW 48.47.020(1). Plaintiffs contend that these provisions were not complied with in the passage of the Act. Thus, they reason, our interpretation of the Act as a kind of mandated benefit law renders it invalid as a matter of state law.

We reject plaintiffs' argument for two reasons. First, as the movants for summary judgment, the plaintiffs bore the burden of

providing sufficient evidence to establish a prima facie case that RCW 48.47.005.–.030 were not complied with, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The conclusory affidavits that were submitted on the issue of failure to comply with RCW 48.47.020(1) were not based on first-hand knowledge and were thus insufficient to establish a prima facie case.

Second, and more importantly, RCW 48.47.005–.030 apply only to Washington laws that establish a "mandated health benefit," as that term is defined in RCW 48.47.010(7), *not* as that term might be understood in ERISA case law. RCW 48.47.010(7) defines a "mandated health benefit" as a legal requirement to "(a) Cover a specific health care service or services; (b) cover treatment of a specific condition or conditions; or (c) contract, pay, or reimburse specific categories of health care providers for specific services ...." The benefits conferred by the Act are the expanded treatments available to insureds, and the concomitant spreading of risk, due to the increase in the categories of providers able to provide treatment. Obviously, then, subsections (a) and (b) are inapplicable because the Act does not require the coverage of any *specific* health care service or condition. Subsection (c) comes closer, but ultimately fails because of the words "for specific services." Thus, our construction of the Act does not turn it into a "mandated health benefit" law within the meaning of RCW 48.47.010(7); therefore, RCW 48.47.005–.030 do not apply.[3]

### IV.

The district court's grant of summary judgment in favor of the plaintiffs is reversed, and the case is remanded with instructions to enter summary judgment for the defendants.

**REVERSED and REMANDED.**

---

**3.** The premise of the plaintiffs' argument that RCW 48.47.005–.030 were violated in the passage of the Act is that such a violation would render the Act invalid as a matter of state law.

In light of our conclusion that these provisions do not apply, we need not address the more difficult question of what would happen if they did apply and were not complied with.