# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 00-2788

_____

Express Scripts, Inc.; Associated     *
Industries of Missouri; Missouri     *
Chamber of Commerce; St. Louis     *
Area Business Health Coalition,     *
    *
       Plaintiffs - Appellants,     *
    *   Appeal from the United States
    v.     *   District Court for the Western
    *   District of Missouri.
Keith Wenzel, Acting Director of     *
the Missouri Department of Insurance,     *
    *
       Defendant - Appellee.     *
    *
_____     *
    *
Secretary of Labor,     *
    *
       Amicus on Behalf     *
       of Appellee.     *

_____

Submitted: April 11, 2001

Filed: August 22, 2001

_____

Before WOLLMAN, Chief Judge, MURPHY, Circuit Judge, and GOLDBERG, Judge.[1]

_____

MURPHY, Circuit Judge.

At issue in this case is whether certain provisions of Missouri law are preempted by the Employee's Retirement Income Security Act of 1974 (ERISA). The provisions regulate some aspects of how Missouri health maintenance organizations (HMOs) provide prescription drugs through network pharmacies. Express Scripts, Inc. (Express), which has a mail order pharmacy, and several business groups brought this action for injunctive and declaratory relief against Keith Wenzel, the acting director of the Missouri Department of Insurance, arguing that the Missouri provisions could not be enforced because they were preempted by ERISA. After the district court[2] granted Wenzel's motion for summary judgment, plaintiffs appealed and the United States Secretary of Labor filed an amicus brief supporting one of Wenzel's theories for affirmance. We conclude that the challenged provisions fall within ERISA's savings clause and therefore affirm.

I.

The Missouri legislation which led to this lawsuit was enacted in 1997. Prior to that time, some Missouri HMOs provided incentives to enrollees to fill maintenance prescriptions at mail service pharmacies, rather than at local retail pharmacies. A maintenance prescription is one providing medication to treat a medical condition for a period of greater than 30 days, see Mo. Rev. Stats. § 354.535.5, and an enrollee

---

[1]The Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

[2]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

might prefer to obtain a large supply of such medication to avoid the nuisance of more frequent purchase. Prior to the enactment of the Missouri statutes, an HMO could limit the quantity enrollees could obtain from retail pharmacies to a 30 day supply while allowing them to obtain up to a 90 day supply from a mail service pharmacy. An HMO also could charge enrollees a higher copayment to fill a maintenance prescription at a retail pharmacy than at a mail order pharmacy. Such a mail service pharmacy provider would give discounts to the HMO in return for the benefit of becoming the preferred provider of maintenance prescriptions and the exclusive provider in the network of 90 day prescriptions.

The Missouri legislature enacted Mo. Rev. Stat. §§ 354.535.3 and 354.535.4 in 1997. Section 354.535.3 requires HMOs to charge the same copayment for prescription drugs from any network pharmacy which meets the HMO product cost determination:

> Every *health maintenance organization* shall apply the same coinsurance, co-payment and deductible factors to all drug prescriptions filled by a pharmacy provider who participates in the health maintenance organization's network if the provider meets the contract's explicit product cost determination. If any such contract is rejected by any pharmacy provider, the health maintenance organization may offer other contracts necessary to comply with any network adequacy provision of this act. However, nothing in this section shall be construed to prohibit the health maintenance organization from applying different coinsurance, copayment and deductible factors between generic and brand name drugs.

Mo. Rev. Stat. § 354.535.3 (emphasis added). Section 354.535.4 prevents HMOs from limiting the quantity of drugs an enrollee can obtain at one time unless the limit applies to all pharmacy providers:

> *Health maintenance organizations* shall not set a limit on the quantity of drugs which an enrollee may obtain at any one time with a prescription,

unless such limit is applied uniformly to all pharmacy providers in the health maintenance organization's network.

Id. at § 354.535.4 (emphasis added).

Appellants Express, Associated Industries of Missouri, Missouri Chamber of Commerce, and St. Louis Area Business Health Coalition sued Keith Wenzel, the acting director of the Missouri Department of Insurance. They sought an injunction against enforcement of the statutes and a declaratory judgment that the statutes and related regulation, 20 C.S.R. 400-7.400, are preempted by ERISA. After discovery was complete, the parties filed cross motions for summary judgment. The district court granted Wenzel's motion, and dismissed the case after concluding that the Missouri statutes do not fall within the scope of ERISA preemption because they do not "relate to" employee benefit plans. The court reasoned that the statutes do not act "immediately and exclusively" on such plans, but only indirectly, and that the existence of ERISA plans is not essential to their operation. It also concluded that the statutes were saved from ERISA preemption because they regulate HMOs which are in the business of insurance.

Appellants argue that the district court erred in dismissing their claims. They say that the statutes are within the scope of ERISA preemption because they relate to employee benefit plans since they directly regulate health benefit plans and impact plan structure, administration, and finances. They argue that the provisions are not saved by the insurance exception because HMOs are not in the insurance business. Wenzel responds that the statutes do not come within ERISA preemption because they affect employee benefit plans only indirectly. He and amicus United States Secretary of Labor both argue that the Missouri provisions are saved from preemption in any case because they regulate HMOs which are in the business of insurance.

## II.

Employee benefit plans are comprehensively regulated by ERISA, 29 U.S.C. §§ 1001 et seq. (the Act). Such plans are established by employers and typically include retirement and health care benefits. At the time it enacted ERISA, Congress was concerned primarily with protecting employees from losing their anticipated retirement benefits. See 29 U.S.C. § 1001 (congressional findings and declaration of policy). The Act establishes minimum requirements to protect employee benefits. See id.; H.R. REP. No. 93-533 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4640,4643-46; SEN. REP. No. 93-127 (1973), *reprinted in* 1974 U.S.C.C.A.N 4639, 4844-47. The Act also includes a broad preemption provision, declaring that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." 29 U.S.C. § 1144(a). The preemption provision was included to prevent states from interfering with the Act's intended protection of employees by inconsistent legislation or regulation. See H.R. REP. No. 93-533 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4655; SEN. REP. No. 93-127 (1973), *reprinted in* 1974 U.S.C.C.A.N 4639, 4871.

The preemption provision has been construed broadly. A state law "relates to" an ERISA plan and is preempted if it has "a connection with or a reference to such a plan." New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656 (1995). A state law does not have to act directly on an ERISA plan to be preempted. See Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 139 (1990). State laws that are not targeted at ERISA plans, but which indirectly force a plan administrator to make a particular decision or take a particular action may be held to "relate to" employee benefit plans. See, e.g., Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 739 (1985) (Massachusetts law requiring insurance

companies to provide minimum mental health care benefits to insureds is related to ERISA plans); Moran v. Rush Prudential HMO, Inc., 230 F.3d 959, 968-69 (7th Cir. 2000), cert. granted, 69 U.S.L.W. 3459, 3799, 3807 (U.S. June 29, 2001) (No. 00-1021) (Illinois law requiring HMOs to submit disputes over whether a treatment is medically necessary to independent review is related to ERISA plans).

ERISA also contains a savings clause to prevent certain state laws from being preempted: "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A). ERISA's legislative history does not include a discussion of either employee health plans or the Act's savings clause. See Metropolitan Life, 471 U.S. at 745-46.

In Metropolitan Life, the Supreme Court turned to the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq., to inform its understanding of the ERISA savings clause. See id. at 742-44. The McCarran-Ferguson Act predates ERISA, and it also protects state insurance laws from federal preemption. See id. at 744 n.21. The purpose of the McCarran-Ferguson Act was explained in a policy statement in its legislative history:

> Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

15 U.S.C. § 1011. Congress thus chose to ensure that regulation of the insurance industry continue to be left to state governments. See Metropolitan Life, 471 U.S. at 744, n. 21; S. REP. NO. 20 at 1 (1945); H.R. REP. NO. 143 (1945), *reprinted in* 1945 U.S.C.C.A.N. 670.

Under the McCarran-Ferguson Act, state laws regulating the business of insurance are not preempted by a federal statute unless Congress clearly communicates a specific intent to preempt. See 15 U.S.C. § 1012(b)[3]; COUCH ON INS. 3D § 2:4 at 12. Since the ERISA preemption provision is broad enough to encompass state laws regulating insurance, it could have been interpreted to preempt them if Congress had not added the savings clause. See COUCH § 2:4 at 13-14. The Supreme Court concluded in Metropolitan Life that the ERISA savings clause was enacted "to preserve the McCarran-Ferguson Act's reservation of the business of insurance to the States," 471 U.S. at 744 n.21, and that it is therefore appropriate to use the older statute as a guide to interpret the ERISA savings clause. See id. at 742-44.

A two step inquiry is used to determine whether a state law is saved from ERISA preemption. See UNUM Life Ins. Co. of Am. v. Ward, 526 U.S. 358, 367 (1999). The first question is whether the law regulates insurance under a "common-sense view of the matter." Id. (quoting Metropolitan Life Ins. Co., 471 U.S. at 740). The second step involves consideration of three factors used to determine if a law regulates the "business of insurance" within the meaning of the McCarran-Ferguson Act: does the law transfer or spread an insured's risk, does it deal with "an integral part of the policy relationship between the insurer and the insured," and is it "limited to entities within the insurance industry[?]" Id. (quoting Metropolitan Life, 471 U.S. at 743).

---

[3]Section 1012(b) provides that:

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That . . . the Sherman Act, . . . the Clayton Act, and . . . the Federal Trade Commission Act . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C. § 1012 (b) (italics in the original).

Courts are to start with the "presumption that Congress does not intend to supplant state law." Travelers Ins. Co., 514 U.S. at 654. This is particularly true in the case of general health care regulation, where a clear and manifest purpose of Congress is required to overcome the presumption. See id. at 655, 661.

## III.

If the Missouri laws in question regulate insurance, they will be saved from preemption even if they relate to ERISA plans. Appellants argue that common sense dictates that the statutes do not regulate insurance. They say that Missouri HMOs are not insurers because they provide health care on a prepaid basis rather than by indemnifying their customers and because they are licensed and regulated under different statutory provisions than insurance companies. They argue that the statutes in question regulate pharmacies, rather than insurance. Wenzel responds that HMOs spread and shift risk just like insurance and that the statutes were directed at the insurance industry because they were designed to benefit HMO enrollees who are in the position of insureds. The Secretary of Labor says that HMOs are an innovative form of insurance and that Missouri regulates them and traditional insurance companies in similar ways.

## A.

Under Missouri statutes HMOs are included within the definition of "insurer" and are treated similarly to insurance companies. "'Insurance company' or 'insurer'" is defined, in part, as "any other legal entity engaged in the business of insurance, including . . . *health maintenance organizations* . . . unless their exclusion from this definition can be clearly ascertained from the context of the particular statutory section under consideration." Mo. Rev. Stat. § 375.012.5 (emphasis added). Missouri HMOs and insurance companies are regulated similarly in degree and substance. HMOs and traditional insurance companies are all supervised by the Missouri Department of

Insurance. See id. at §§ 354.485, 374.010. They all are highly regulated. They all are subject to minimum standards for customer contracts, financial reporting requirements, maintenance of a minimum statutory net worth, periodic examination by the Missouri Department of Insurance, and use of actuarial analysis to determine health care rates. See Appendix at 509 (Wenzel Affidavit). In the event of financial failure, both HMOs and insurance companies are rehabilitated, liquidated, or conserved by the Missouri Department of Insurance. See id. Appellants have not shown any substantive differences between the laws regulating HMOs and those regulating insurance companies, and we conclude that the fact that separate statutory sections govern their regulation is not dispositive of the issue of whether they should be considered insurers.

The distinguishing feature of insurance is the "spreading and underwriting of a policyholder's risk." Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 211 (1979). An insurance company performs this function by assuming the risk that its customers' health care costs might exceed the premiums they pay. See Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 339 n.7 (1982). HMOs differ from traditional insurance companies in that they contract to provide specified health care for a fixed fee and they make arrangements for that care by entering into a contractual arrangement with a group of physicians or other health care providers. See Pegram v. Herdrich, 530 U.S. 211, 218-19 (2000). Just as an insured is protected from risk by a traditional insurance contract, an enrollee in an HMO is protected from the risk of higher health care expenses by placing the risk on either the HMO or the health care providers. See id. (risk borne by HMOs); Maricopa County Med. Soc'y, 457 U.S. at 339 n.7 (1982) (risk borne by health care providers).

In this way HMOs both spread and underwrite risk, and we agree with other circuit courts which have concluded that HMOs are insurers. See Kentucky Ass'n of Health Plans, Inc. v. Nichols, 227 F.3d 352, 364-65 (6th Cir. 2000), petition for cert. filed, 69 U.S.L.W. 3646 (U.S. Mar. 22, 2001) (No. 00-1471); Corporate Health Ins., Inc. v. Texas Dep't of Ins., 215 F.3d 526, 538 (5th Cir. 2000) petition for cert. filed, 69

U.S.L.W. 3317 (U.S. Oct. 24, 2000) (No. 00-665); <u>Washington Physicians Serv. Ass'n v. Gregoire</u>, 147 F.3d 1039, 1045-46 (9th Cir. 1998), <u>cert. denied</u>, 525 U.S. 1141 (1999); <u>Anderson v. Humana, Inc.</u>, 24 F.3d 889, 892 (7th Cir. 1994). <u>But see</u> <u>O'Reilly v. Ceuleers</u>, 912 F.2d 1383, 1389 (11th Cir. 1990).

B.

Appellants argue that even if HMOs are insurers, the challenged Missouri provisions do not regulate insurance. They claim the Missouri statutes are directed at pharmacies rather than the insurance industry and that they should be preempted like the Arkansas law in <u>Prudential Ins. Co. v. Nat'l Park Med. Ctr.</u>, 154 F.3d 812 (8th Cir. 1998). Wenzel counters that the Missouri legislature was concerned for consumers and that the Missouri statutes are very different from the one in <u>National Park</u>.

A law regulates insurance under a common sense approach when it is "specifically directed toward that industry." <u>Pilot Life Ins. Co. v. Dedeaux</u>, 481 U.S. 41, 50 (1987). "Statutes aimed at protecting or regulating [the relationship between an insurer and insured], directly or indirectly, are laws regulating the 'business of insurance.'" <u>Metropolitan Life</u>, 471 U.S. at 744 (citation omitted). A law thus regulates insurance under a common sense approach if it benefits insureds by affecting their relationship with their insurers. <u>See</u> <u>Moran</u>, 230 F.3d at 969; <u>Gregoire</u>, 147 F.3d at 1046.

The way in which Mo. Rev. Stat. §§ 354.535.3 and 354.535.4 are written shows that they are directed at HMOs, not any other industry. The former begins with these words: "*Every health maintenance organization* shall apply the same coinsurance . . ." Mo. Rev. Stat. § 354.535.3 (emphasis added), and the other with: "*Health maintenance organizations* shall not set a limit . . . ." <u>Id.</u> at § 354.535.4 (emphasis added). The statutes then go on to prohibit contractual barriers previously used by

-10-

HMOs to limit choice and convenience for enrollees needing maintenance prescriptions.

Prior to the enactment of the Missouri statutes, enrollees of some HMOs were required to obtain maintenance prescriptions from mail order pharmacies if they wished to receive a 90 day supply. Those who obtained drugs through mail service were required to make their orders well in advance of when they were needed. See Appendix at 173 (an Express pamphlet warning subscribers to allow ten to fourteen business days for their prescriptions to be filled). The record contains the testimony of several Missouri pharmacists who reported that enrollees complained that mail order houses did not fill their prescriptions in the time promised and they were forced either to obtain higher priced emergency supplies from retail pharmacies or to forgo taking needed medication during the interim. See id. at 532-46 (Forrester, Keener, Mitchell, Taylor, and Hartwig affidavits). Some enrollees also disliked having to ask strangers about their medications over the phone.[4] See id. The statutes benefited enrollees by removing contractual restrictions imposed by Missouri HMOs that impeded timely and

---

[4]It is not clear whether the enactment of the 1997 statutes was induced by any such complaints, for the Missouri legislature does not record debates or publish committee reports. See Roosevelt Fed. Sav. & Loan Ass'n v. Crider, 722 S.W.2d 325, 328 n.3 (Mo. Ct. App. 1986). Wenzel submitted affidavits from Missouri State Representative Timothy Harlan, the bill's sponsor, and George Oestreich, the chief executive officer of the Missouri Pharmacy Association and lobbyist for the Missouri statutes. See Appendix at 519, 526. Both testified that the statutes were intended to benefit enrollees by giving them the flexibility to fill maintenance prescriptions at retail pharmacies and to "level the playing field" for retail pharmacies who wished to fill such prescriptions. Neither affidavit conclusively demonstrates the legislature's intent, because Oestreich is not a legislator and post-enactment statements of even a bill's sponsor are not entitled to much weight. See Western Air Lines, Inc. v. Bd. of Equalization of S.D., 480 U.S. 123, 130-31 n.* (1987); Chrysler Corp. v. Brown, 441 U.S. 281, 311 (1979); Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 118 n.13 (1980).

convenient access to prescription drugs and to personal contact with local pharmacists.[5] The language of the statutes was specifically directed at HMOs and we conclude that the provisions regulate insurance under the common sense test. They are unlike the Arkansas statute in National Park which applied broadly to other types of entities beyond the insurance industry. See National Park, 154 F.3d at 829-30. They protect and regulate the relationship of enrollees and their HMOs and are specifically targeted at this type of insurance. See Metropolitan Life, 471 U.S. at 744.

C.

Not any one of the McCarran-Ferguson factors is dispositive, for each is only a "guidepost," and not all three have to be satisfied to save a state law from preemption.[6]

_____

[5]Appellants assert that the statutes were enacted to benefit retail pharmacies, but documents which they cite contain no comment on the legislature's intent. The cited press release and fiscal impact statement are not evidence of legislative intent because they were issued by the Missouri Department of Insurance, not a legislative body. See Mo. Rev. Stat. § 374.010 (Department of Insurance is created by statute and has only enforcement powers). Similarly, the Missouri House of Representatives bill summaries are not statements of legislative intent, but are only summaries of the contents of the bill. See Missouri State Senate Glossary of Legislative Terms, at http//:www.senate.state.mo.us/glossary.htm (last visited August 1, 2001).

[6]Much of appellants' briefs are devoted to the argument that the Missouri statutes are like "any willing provider" laws which may not meet the three factor test. Such a law requires an HMO to allow any area provider willing to meet contract terms to be included in its network. See, e.g., National Park, 154 F.3d at 816. The category itself is not determinative, however. Whether a state law falls within the ERISA savings clause depends on the facts of the case, and several any willing provider laws have been found have to been saved. See, e.g., Nichols, 227 F.3d at 368-72; Texas Pharm. Ass'n v. Prudential Ins. Co. of Am., 105 F.3d 1035, 1040-42 (5th Cir. 1997), cert. denied, 522 U.S. 820 (1997) (unamended statute saved); Stuart Circle Hosp. Corp. v. Aetna Health Mgmt., 995 F.2d 500, 504 (4th Cir. 1993), cert. denied, 510 U.S. 1003 (1993); Blue Cross & Blue Shield of Kansas City v. Bell, 798 F.2d 1331, 1334-36 (10th

Ward, 526 U.S. at 373-74. The Supreme Court has understood both the McCarran-Ferguson Act and the ERISA savings clause to be consumer protection laws, concerned with "[t]he relationship between insurer and insured, *the type of policy which could be issued*, its reliability, its interpretation, and enforcement – these were the core of the 'business of insurance' . . . . [T]he focus [of the statutory term] was on the relationship between the insurance company and the policyholder." Metropolitan Life, 471 U.S. at 743-44 (quoting Sec. & Exch. Comm'n v. Nat'l Sec. Inc., 393 U.S. 453, 460 (1969), emphasis and alterations in the original). State laws that control the terms of insurance contracts are generally seen to regulate insurance under either the McCarran-Ferguson Act or the ERISA savings clause. See id. at 744.

Appellants contend that Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205 (1979), leads to the conclusion that the Missouri statutes do not satisfy any of the McCarran-Ferguson factors. In Royal Drug a number of pharmacists brought an antitrust action against an insurance company that required all pharmacies servicing its policyholders to enter into contracts to sell prescription drugs for two dollars above cost. See 440 U.S. at 205, 209. Policyholders could purchase drugs from these pharmacies for $2, but they were required to pay higher prices if they filled prescriptions at pharmacies without company contracts. See id. at 209. The price fixing agreements between the insurance company and the pharmacies were held not to be the business of insurance. See id. at 213-17.

Royal Drug is not on point, however, because it was concerned only with an arrangement between the pharmacies and the insurance company which the Court looked at skeptically because exemptions from antitrust law are narrowly construed. See id. at 231. The Court did not address the question of whether the contractual arrangements between the insurance company and its policyholders might be considered the business of insurance. See id. at 230 n.37. Here, the Missouri laws in

Cir. 1986).

question have direct effects on the contractual arrangements between HMOs and enrollees, and the presumption is against preemption. See Metropolitan Life, 471 U.S. at 740.

The first McCarran-Ferguson question is whether the Missouri statutes shift or transfer risk. See Ward, 526 U.S. at 367. Prior to the enactment of the Missouri statutes, enrollees were required to make higher copayments if they obtained their maintenance prescriptions from retail pharmacies. They thus bore the risk of higher drug costs if there were a delay in obtaining their prescriptions from a mail order pharmacy. Because the Missouri statutes no longer allow HMOs to make mail order pharmacies the exclusive providers of 90 day prescriptions, HMOs are no longer able to obtain the previous discounts on mail order contracts. See Appendix at 99-100 (Low Affidavit). This increases the cost of prescriptions, which HMOs must either absorb or pass along. The statutes therefore transfer or spread the risk of higher prescription costs.

The second question is whether the state law alters an integral part of the policy relationship between the insurer and the insured. See Ward, 526 U.S. at 367. Laws that affect the type of policy an insurer may issue or that mandate that a contract term be included within an insurance contract satisfy this factor. See id. at 374-75. The Missouri statutes alter the type of policy an HMO may offer because they require that enrollees be allowed to obtain maintenance prescriptions at retail pharmacies without being penalized. The second McCarran-Ferguson factor is easily satisfied.

The third question is whether the regulation is limited to entities within the insurance industry. See id. at 367. Common law breach of contract and bad faith claims such as those in Pilot Life are not limited to the insurance industry because they stem from general principles of tort and contract law. See 481 U.S. at 51. Unlike general common law claims which are applicable to any industry, the Missouri statutes regulate only HMOs. Appellants argue that the drug provisions are not limited to the

insurance industry because they also regulate pharmacies. While pharmacies are affected by the law, they are not regulated by it. They are not penalized for not complying with the statutes or prevented from entering into these arrangements with anyone other than HMOs. The McCarran-Ferguson test does not require that the regulation have no indirect affects on other entities. See Nichols, 227 F.3d at 355 n.3; Gregoire, 147 F.3d at 1042; Bell, 798 F.2d at 1333. The third factor is thus satisfied, and we conclude that under the McCarran-Ferguson tests, the challenged Missouri provisions regulate the business of insurance.

## IV.

Since Missouri HMOs are insurers and the challenged Missouri statutes regulate insurance under a common sense test and under the McCarran-Ferguson factors, the statutes fall within the ERISA savings clause and are not preempted. The district court thus did not err in granting summary judgment to Wenzel, and we need not reach the question of whether the statutes relate to any employee benefit plan. The judgment is affirmed.

A true copy.

   ATTEST:

         CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.