**EXPRESS SCRIPTS, INC., et al., Plaintiffs,**

v.

**Keith WENZEL, Defendant.**

**No. 98–4285–CV–C–5–ECF.**

United States District Court, W.D. Missouri, Central Division.

June 12, 2000.

David M. Harris, Dawn M. Johnson, Greensfelder, Hemker & Gale, P.C., St. Louis, MO, for Express Scripts, Inc., Associated Industries of Missouri, Missouri Chamber of Commerce, St. Louis Area Business Health Coalition, plaintiffs.

Charles W. Hatfield, Eric Michael Walter, Ronald Molteni, Missouri Attorney General's Office, Jefferson City, MO, for Keith Wenzel, defendant.

## MEMORANDUM AND ORDER

LAUGHREY, District Judge.

This case involves whether a Missouri statute and its accompanying regulations are preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* The challenged state law essentially forbids health maintenance organizations ("HMOs") from re-

quiring their enrollees to have their prescriptions filled by mail service pharmacies rather than retail pharmacies. The statute accomplishes this goal by regulating the contracts that HMOs enter with pharmacies. *See* Mo.Rev.Stat. §§ 354.535.3 and 354.535.4 and 20 C.S.R. 400–7.400 (hereinafter referred to as "H.B. 335"). Plaintiffs assert that H.B. 335 "relates to" employee welfare benefit plans regulated by ERISA, and is therefore preempted. *See* 29 U.S.C. § 1144(a)(2)(A) (preempting state law that "relates to" employee welfare benefit plans). Defendant Keith Wenzel, the Director of the Missouri Department of Insurance, denies this assertion and argues that the law constitutes permissible state regulation of insurance. *See* 29 U.S.C. § 1144(b) (saving state insurance regulation from ERISA preemption).

Pending before the Court are cross-motions for summary judgment. After considering the parties' briefs and the oral argument presented on May 31, 2000, the Court concludes that Missouri's statute is not preempted by ERISA.

### I. *Factual Background*

The material facts in this case are few and undisputed. Plaintiff Express Scripts, Inc. ("Express Scripts") provides prescription drugs through the mail to enrollees of HMOs throughout the United States, including Missouri. Some of these HMO memberships were purchased by ERISA-governed health plans in Missouri. Before H.B. 335 went into effect, Express Scripts was the exclusive provider of 90–day supplies of drug prescriptions for several Missouri-licensed HMO clients. Because of the statute, Express Scripts is no longer the exclusive provider to these customers. Express Scripts and several other Plaintiffs[1] seek a judgment that H.B. 335 is preempted by ERISA.

ERISA regulates employee welfare benefit plans, which include "any plan, fund, or program ... established or maintained by an employer or by an employee organization, or by both, [that] was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, medical, surgical, or hospital care or benefits." 29 U.S.C. § 1002(1). Thus, when an employer establishes or maintains an ERISA-governed employee health plan, these plans may be either self-funded or insured. In self-funded plans, the employer bears ultimate financial responsibility for paying plan expenses. In insured plans, the employer contracts with a third-party, typically a licensed entity such as an indemnity insurer or an HMO, which assumes the financial risk for providing a specified scope of benefits and performing related administrative services.

Employers who provide insured ERISA health plans contract with indemnity insurers, HMOs, or other entities that bear the risk that the employees will require medical care. An indemnity insurer is a company that provides reimbursement for specified medical expenses in exchange for payment of premiums. This form of health coverage is primarily a financing system as opposed to a health care delivery system. When the insured patient incurs a health care expense, the insurer indemnifies the patient for that loss up to a specified limit. By contrast, HMOs create comprehensive health care delivery networks to provide physician, hospital, and pharmacy services to enrollees. HMOs create these networks by entering a series of contracts with providers. These contracts typically include a rate or reimbursement that the provider agrees to be paid for the covered services.

HMOs in Missouri have been subject to functionally the same regulation by the

---

**1.** Defendant asserts that several of the other Plaintiffs have "standing problems." The Court does not reach this question, because Express Scripts clearly has standing to bring this challenge. Further, the Plaintiffs are jointly represented and have filed the same briefing. Thus, even if the Court were to conclude that the other Plaintiffs lacked standing, that ruling would have no effect on this suit.

Missouri Department of Insurance as that applied to indemnity insurance companies. For example, both types of entities are subject to similar financial reporting requirements, statutory net worth requirements, and periodic examination by the Missouri Department of Insurance. Rates for health care provided by HMOs and indemnity insurers are both calculated by actuarial analysis, and the risk that the cost of health care benefits will exceed prepaid revenues is essentially the same for both types of entities.

In Missouri, HMOs are required to contract with a certain number and type of providers in order to maintain adequate networks. HMOs usually require enrollees to pay only nominal copayments for each service the patient receives from a participating provider, such as $10.00 for a doctor's office visit. Typically, enrollees face higher copayments unless they obtain care from the HMOs' participating providers. HMOs also sometimes encourage enrollees to obtain services from certain subsets of participating providers. They do this through "benefit design," which is structuring the benefit program in such a way that it creates incentives such as lower copayments for enrollees to use one participating provider instead of another.

To provide pharmacy services for enrollees, Missouri-licensed HMOs may use a combination of both retail and mail service pharmacies. Retail pharmacies are stores, such as Walgreens, where an enrollee can purchase prescription medications. The advantage of retail pharmacies is their ability to immediately fill prescriptions that are needed for emergency or acute care needs. Mail service pharmacies, as their name implies, fill enrollees' prescriptions through the mail. Mail service pharmacies have been used by HMOs in Missouri to fill "maintenance prescriptions," 90–day supplies of drugs used to treat conditions such as arthritis and high blood pressure. Patients receiving maintenance prescriptions usually must take their medication every day without interruption, and consequently must have a supply of their prescriptions at all times. Customers ob-

taining maintenance prescriptions from a retail pharmacist had the opportunity to consult with the pharmacist in person, while customers obtaining such prescriptions through the mail could only speak "with a strange pharmacist through a toll-free number." Def.'s Ex. 6 at 3. Several retail pharmacists have testified that customers have come to their stores seeking short-term prescription refills to meet their needs until a mail service pharmacy is able to send a 90–day supply of the medication. Express Scripts takes 10 to 14 days to fill a mail order prescription. Thus, even HMOs that use mail service pharmacies to provide maintenance prescriptions continue to have retail pharmacies in their networks to fill prescriptions of 30 days or less.

The Missouri legislature has passed a statute, H.B. 335, that forbids HMOs from charging patients higher fees for filling their prescriptions at local pharmacies rather than through mail order pharmacies, as long as the local pharmacies meet the HMOs' specified price requirements:

> Every health maintenance organization shall apply the same coinsurance, copayment and deductible factors to all drug prescriptions filled by a pharmacy provider who participates in the health maintenance organization's network if the provider meets the contract's explicit product cost determination. If any such contract is rejected by any pharmacy provider, the health maintenance organization may offer other contracts necessary to comply with any network adequacy provisions of this act. However, nothing in this section shall be construed to prohibit the health maintenance organization from applying different coinsurance, copayment and deductible factors between generic and brand name drugs.

Mo.Rev.Stat. § 354.335.3. Regardless of whether local pharmacies agree to meet an HMO's price requirements, H.B. 335 also forbids HMOs from limiting the quantity

of drugs a patient may purchase from a local pharmacy:

> Health maintenance organizations shall not set a limit on the quantity of drugs which an enrollee may obtain at any one time with a prescription, unless such limit is applied uniformly to all pharmacy providers in the health maintenance organization's network.

Mo.Rev.Stat. § 354.335.4. Thus, the statute requires HMOs to allow patients to choose between having their maintenance prescriptions filled by a retail pharmacy or a mail service pharmacy, assuming that both kinds of pharmacies are in the HMOs' networks. However, if a retail pharmacy in the network refuses to meet the HMOs' price cost determination, then the HMO may use "benefit design" to encourage enrollees to use the mail service pharmacy.

One legislative purpose in enacting H.B. 335 was to preclude the practice of HMOs from differentiating between pharmacies within their networks by allowing only mail-order pharmacies to fill certain long-term or high volume prescriptions while limiting retail pharmacies to shorter or lesser quantity prescriptions. Another purpose was to allow patients insured through HMOs the option to choose between having their maintenance prescriptions filled at a local retail pharmacy or by mail order. [Harlan Aff. at ¶ 6].

Many ERISA plans provide health care benefits by contracting with HMOs. However, HMOs are just one type of health care service provider capable of administering pharmacy benefits to an ERISA plan's participants and beneficiaries. Nothing in H.B. 335 forbids ERISA plans from contracting with a non-HMO provider to arrange whatever pharmaceutical services the ERISA plan desires. Also, nothing in H.B. 335 requires HMOs to open their networks to any willing pharmacy provider.

## II. *Summary Judgment Standard*

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A defendant who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir.1991) (citation omitted). The main purpose of a motion for summary judgment is to identify factually unsupported claims. If a plaintiff has the burden of proof at trial on a claim and the defendant has filed a motion for summary judgment, the plaintiff must identify admissible evidence sufficient to make a submissible case at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the plaintiff cannot identify such facts, the defendant is entitled to judgment as a matter of law. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## III. *Discussion*

▮ ERISA preempts state laws that "relate to" any employee welfare benefit

plan described in the statute. 29 U.S.C. § 1144(a). However, ERISA's "saving clause" exempts state regulation of insurance from preemption. 29 U.S.C. § 1144(b). Resolving a preemption issue therefore requires a two-part analysis: (1) whether the challenged law "relates to" an ERISA plan; and (2) if so, whether the law regulates insurance.

### A. Whether H.B. 335 "Relates to" ERISA Plans

Because of the vagueness of the term "relate to," the scope of ERISA preemption has "troubled the courts of appeals and the Supreme Court." *Prudential Ins. Co. of Am. v. National Park Med. Ctr.*, 154 F.3d 812, 818 (8th Cir.1998). Preemption analysis turns on congressional intent, and must begin "with the starting presumption that Congress does not intend to supplant state law." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654–55, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995); *accord Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 208, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) (Congressional intent is the "ultimate touchstone" of preemption analysis). Congress' primary intent in passing ERISA was to protect participants in employee benefits plans. 29 U.S.C. § 1001(b) (stating purpose of statute).

The Supreme Court has "long acknowledged that ERISA's preemption provision is clearly expansive." *California Div. of Labor Standards Enforcement v. Dillingham Constr.*, 519 U.S. 316, 324, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (*quoting Travelers*, 514 U.S. at 656, 115 S.Ct. 1671). The preemption clause has "a broad scope, and an expansive sweep, and [is] broadly worded, deliberately expansive, and conspicuous for its breadth." *Id.* Nevertheless, "[i]f 'relate to' were taken to extend to the furthest stretch of indeterminacy, then for all practical purposes pre-emption would never run its course, for '[r]eally,

universally, relations stop nowhere.'" *Travelers*, 514 U.S. at 655, 115 S.Ct. 1671. Thus, "[t]he mere mention of an ERISA plan in a complaint is not, in and of itself, sufficient to warrant a finding that state law relates to a plan." *In Home Health, Inc. v. Prudential Ins. Co. of Am.*, 101 F.3d 600, 604 (8th Cir.1996).

■ "Congress did not define what it meant by state laws that 'relate to' an ERISA benefit plan anywhere in the statute." *Nat'l Park*, 154 F.3d at 819. However, the term should be given its broad, common sense meaning. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). In *Shaw*, the Supreme Court developed a two-prong analysis for determining whether state law "relates to" an ERISA plan. 463 U.S. at 96–97, 103 S.Ct. 2890. A law relates to an employee benefit plan if it either has a "connection with" or makes "reference to" such a plan. *Id.; accord Nat'l Park*, 154 F.3d at 819 (noting that this two-prong analysis is still applied by the Supreme Court).

### 1. "Reference to"

■ Plaintiffs first argue that Missouri's law makes "reference to" ERISA plans. Congress intended to preempt all state laws with such improper references, assuming that the laws were not permissible insurance regulations: "[T]he presumption that Congress does not intend to supplant state law is necessarily overcome when the state law has an inappropriate 'reference to' ERISA or ERISA plans, as such an improper reference is defined in pre-*Travelers* precedent." *Nat'l Park*, 154 F.3d at 822.² A state law may be preempted because of a reference to ERISA plans in three circumstances: (1) the state law "impos[es] requirements by reference to ERISA covered programs," *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130–31, 113 S.Ct.

2. The *National Park* Court recognized that while the Supreme Court's decision in *Travelers* may have created a "sea change" in analyzing whether state laws have a "connection with" ERISA plans, *Travelers* did not supplant prior Supreme Court precedent defining "reference to" analysis. 154 F.3d at 822.

580, 121 L.Ed.2d 513 (1992); (2) the state law specifically exempts ERISA plans from an otherwise generally applicable statute, *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 828 n. 2, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988); or (3) the state law premises a cause of action on the existence of an ERISA plan, *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 140, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). *See Nat'l Park*, 154 F.3d at 822 (listing these three situations). Thus, "where a State's law acts immediately and exclusively upon ERISA plans, as in *Mackey*, or where the existence of ERISA plans is essential to the law's operation, as in *Greater Washington Board of Trade* and *Ingersoll–Rand*, that 'reference' will result in preemption." *Dillingham*, 519 U.S. at 325, 117 S.Ct. 832.

Plaintiffs concede that the text of H.B. 335 contains no explicit reference to ERISA or ERISA plans. They nevertheless argue that the statute contains a reference to ERISA plans because of where it was codified. H.B. 335 was codified at Missouri Revised Statute Sections 354.535.3 and 354.535.4. A later section of the Code "exempts" certain ERISA plans [3] from all statutes codified between Sections 354.400 to 354.550, including H.B. 335:

> The provisions of Sections 354.400 to 354.550 shall not apply to any labor organization's health plan providing services established and maintained solely for its members and their dependents, and facilities of not for profit corporations in existence on October 1, 1980, subject either to the provisions and regulations of section 302 of the Labor–Management Relations Act, 29 U.S.C. Section 186 or the Labor–Management Reporting and Disclosure Act, 29 U.S.C. Section 401–538.

Mo.Rev.Stat. § 354.545. Plaintiffs argue that this provision exempts ERISA plans from regulation by H.B. 335 and therefore contains a prohibited reference to ERISA plans according to the Supreme Court's decision in *Mackey*, 486 U.S. at 828, 108 S.Ct. 2182.

*Mackey* held that provisions of state law that exclude ERISA plans from generally applicable statutes are preempted by ERISA. *Mackey*, 486 U.S. at 829, 108 S.Ct. 2182. In *Mackey*, a Georgia statute exempted ERISA pension benefits from certain types of garnishment. *Id.* at 828, 108 S.Ct. 2182. Even though that Georgia statute was consistent with ERISA's objectives, it was preempted because it "single[d] out ERISA welfare benefit plans for different treatment under state law." *Id.* at 830, 108 S.Ct. 2182. The Supreme Court further held that Georgia's generally applicable garnishment procedure was not preempted by ERISA. *Id.* at 830–32, 108 S.Ct. 2182.

The Eighth Circuit interpreted *Mackey* in *National Park*. That case involved an Arkansas's Patient Protection Act ("PPA"), which restricted the ability of health care insurers to limit patients' ability to choose their physicians. 154 F.3d at 816. The statute explicitly exempted ERISA plans from its scope. *Id.* In finding this exemption to be a prohibited "reference to" ERISA plans, the Court first noted that the statute "undeniably makes an express reference to ERISA and attempts to exclude from coverage at least some ERISA plans." *Id.* at 824 (*citing Mackey*, 486 U.S. at 830, 108 S.Ct. 2182). The Court further reasoned that the Arkansas PPA was "specifically designed to affect employee benefit plans even if the effect is to exclude them from coverage of the PPA." *Id.* The Court concluded that the PPA was preempted because it "specifically exempts ERISA plans from an otherwise generally applicable statute." *Id.* For these reasons, the panel held that "this reference to ERISA is sufficient to preempt the Arkansas PPA." [4] *Id.* at 823.

---

3. Defendant concedes that the labor plans mentioned in this passage are ERISA plans. [Def.'s Reply at 7].

4. Although the Eighth Circuit proceeded to give other reasons why the statute was preempted, its language indicates that this exemption alone would have been sufficient to support its holding: "[T]he Arkansas PPA

Defendant responds that H.B. 335, unlike the Arkansas PPA, regulates only HMOs and does not regulate ERISA plans.[5] This difference is dispositive. In *National Park,* the Arkansas PPA regulated "health benefit plans," which were defined as "any entity or program that provides reimbursement, including capitation, for health care services." *Id.* at 816 (*quoting* Ark.Code Ann. § 22–99–203(c)). This sweeping definition included employee welfare benefit plans, which are regulated by ERISA. *Id.* at 825 (concluding that reference in the Arkansas PPA to "health benefit plans" was an implicit reference to ERISA plans). Although the PPA would have applied to ERISA plans because of this definition, the PPA specifically exempted ERISA plans from its scope. Thus, the exemption had a tangible impact on ERISA plans, which was to exempt them from the PPA. *Id.* at 824 (finding that the PPA "singles out ERISA employee welfare benefit plans for different treatment under state law."); *see also Mackey,* 486 U.S. at 830, 108 S.Ct. 2182 (holding that exemption resulted in preemption because it "single[d] out ERISA welfare benefit plans for different *treatment* under state law.") (emphasis added). By contrast, Missouri's H.B. 335 regulates only HMOs and does not regulate ERISA plans. Consequently, the fact that a later section of the code states that H.B. 335

shall not apply to ERISA plans has absolutely no effect.[6] Even in the absence of this "exemption," H.B. 335 would still apply only to HMOs and not to ERISA plans. This difference distinguishes H.B. 335 from the statutes at issue in *National Park* and *Mackey.*

Because Missouri's exemption provision has no effect on ERISA plans, this provision will not result in preemption of H.B. 335 To be preempted, a state law must have more than a *de minimus* effect on ERISA plans. The Eighth Circuit has explained that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." In *Home Health,* 101 F.3d at 604 (*quoting Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. 2890); It therefore follows that the mere mention of ERISA plans in a statutory code would be insufficient to result in preemption of a state statute in the absence of some actual impact on ERISA plans. An example may help to clarify this point. Imagine that the Missouri Legislature passed the following statute: "No statute in Missouri's entire code shall apply to any ERISA plan." Surely, this exemption of ERISA plans would not result in the preemption of all of Missouri's statutes. Such a provision would only raise preemption issues when construed in

undeniably makes an express reference to ERISA and attempts to exclude from coverage of the PPA at least some ERISA plans .... and it is consequently preempted." *Id.* at 824.

5. Defendant also argues that Plaintiffs failed to challenge Section 354.545 in their pleadings, and that its reference to ERISA is therefore beyond the scope of this case. Court rejects Defendant's formalistic distinction. Section 354.545 states that it applies to the prescription laws at issue in this lawsuit. Plaintiffs' pleading that H.B. 335 related to ERISA gave Defendant sufficient notice of this argument, given the liberal pleading standard applicable under the Federal Rules of Civil Procedure. *See generally,* Fed.R.Civ.P. 8 (requiring pleader to provide "a short and plain statement of the claim showing that the pleader is entitled to relief.").

6. Nor does this reading of the statute render meaningless Section 354.545, which exempts ERISA plans from statutes codified between Sections 354.400 to 354.550. Section 354.545 would merely exempt ERISA plans from any other regulations within this section of Missouri's Code that would otherwise apply to them. Further, although the Legislature is presumed to understand the structure of Missouri's Code, it should be noted that H.B. 335 was codified among various other regulations affecting HMOs. The desire to keep HMO regulations together, rather than the desire to "exempt" ERISA plans from H.B. 335 may have been the Legislature's motivation in codifying H.B. 335 at Sections 354.535.3 and 354.535.4.

conjunction with statutes that would otherwise affect ERISA plans. Accordingly, the Court concludes that Missouri Revised Statute Section 354.545 contains no prohibited "reference to" ERISA plans.

In a related argument, Plaintiffs assert that H.B. 335 makes impermissible reference to ERISA by mentioning "health benefit plans." Plaintiffs argue that this term refers to ERISA plans, and that H.B. 335 should therefore be preempted. Although the term "health benefit plan" is not defined under Missouri law, neither party disputes that the term includes ERISA plans. H.B. 335 mentions "health benefit plans" while explaining the meaning of the term HMO. An HMO is defined as an organization that serves "enrollees," and an enrollee is defined as "a policyholder, subscriber, covered person or other individual participating in a *health benefit plan*." Section 354.400(7) (emphasis added).

Plaintiffs note that in *National Park*, the Eighth Circuit found regulation of "health benefit plans" to be sufficient to justify preemption of the Arkansas PPA. 154 F.3d at 824–25. The regulation of health benefit plans by the Arkansas PPA was quite extensive. The Arkansas statute that "[i]t is a violation of this subchapter for any health care insurer or any other person or entity to provide any *health benefit plan* providing for health care services that does not conform to this chapter." *Id.* (*quoting* Ark.Code Ann. § 23–99–206) (emphasis added). The PPA was also passed to allow medical providers to participate in health benefit plans. *Id.* (*quoting* Ark.Code Ann. § 23–99–202). Finally, the statute restricted the ability of health benefit plans to impose quality and cost controls. *Id.* (*quoting* Ark.Code Ann. § 23–99–204(b)). For these reasons, the Eighth Circuit concluded that the statute was "specifically designed to affect employee benefit plans" and that it "imposes requirements by reference to ERISA cov-

ered programs." *Id.* (*quoting Ingersoll–Rand*, 498 U.S. at 140, 111 S.Ct. 478 and *Greater Washington Bd. of Trade*, 506 U.S. at 130–31, 113 S.Ct. 580).

By contrast, H.B. 335 merely mentions health benefit plans, and does not regulate them. The statute only regulates HMOs, for example by requiring them not to discriminate between mail order and retail pharmacies within their networks. While the statute recognizes that many, although not all, enrollees of HMOs will have obtained their memberships through health benefit plans such as ERISA plans, this recognition has no actual effect on ERISA plans.[7] Thus, the mention of "health benefit plans" in H.B. 335 meets none of the three "reference to" tests that have been articulated by the Supreme Court and that were applied by the Eighth Circuit in *National Park*: (1) it does not "impose requirements by reference to ERISA covered programs," *Greater Wash. Bd. of Trade*, 506 U.S. at 130–31, 113 S.Ct. 580; (2) it does not exempt ERISA plans from an otherwise generally applicable statute, *Mackey*, 486 U.S. 825, 828 n. 2, 108 S.Ct. 2182 (1988); and (3) it does not premise a cause of action on the existence of an ERISA plan, *Ingersoll–Rand Co.*, 498 U.S. at 140, 111 S.Ct. 478. The Court therefore concludes that H.B. 335 contains no impermissible "reference to" ERISA plans.

**2. Connection With**

■ Plaintiffs next assert that H.B. 335 is preempted because it has a "connection with" ERISA plans. State laws that either prohibit or mandate particular structures for ERISA plans have prohibited connections with such plans. *Travelers*, 514 U.S. at 658, 115 S.Ct. 1671 (noting that ERISA has preempted "state laws that mandated employee benefit structures or their administration."). Further, "even indirect state action bearing on [ERISA plans] may warrant preemption." *Alessi*

---

7. Whether the regulation of HMO's has a "connection with" ERISA plans will be analyzed in the next section of this Order. For

now, however, it suffices to say that the mention of health benefit plans in H.B. 335 is not a prohibited "reference to" such plans.

v. *Raybestos–Manhattan, Inc.*, 451 U.S. 504, 525, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981). However, in determining whether a state statute has a "connection with" ERISA, courts must begin with a presumption that Congress did not intend to preempt state law. *Travelers*, 514 U.S. at 654, 115 S.Ct. 1671.

▮ The Eighth Circuit has articulated a seven-factor test to help district courts determine whether a state law has a prohibited connection with ERISA plans. The factors are as follows:

(1) Whether the state law negates an ERISA plan provision;

(2) Whether the state law affects relations between primary ERISA entities;

(3) Whether the state law impacts the structure of ERISA plans;

(4) Whether the state law impacts the administration of ERISA plans;

(5) Whether the state law has an economic impact on ERISA plans;

(6) Whether preemption of the state law is consistent with other ERISA provisions; and

(7) Whether the state law is an exercise of traditional state power.

*Arkansas Blue Cross & Blue Shield v. St. Mary's Hosp. Inc.*, 947 F.2d 1341, 1344–45 (8th Cir.1991) (citations omitted). In conducting this analysis, "[t]he court must still look to the totality of the state [law's] impact on the plan—both how many of the factors favor preemption and how heavily each individual factor favors preemption are relevant." *Id.* at 1345.

The dispute in this case centers around whether H.B. 335 mandates the structure and administration of ERISA plans, which are two of the *St. Mary's* factors. Plaintiffs argue that H.B. 335 mandates the structure and administration of prescription benefits because ERISA plans in Missouri no longer have the option of contracting with HMOs that provide maintenance prescription benefits exclusively through mail order pharmacies.

The *Travelers* Court gave several examples of state laws that mandated the structure or administration of ERISA plans. In each of the cases described, the connection between the state laws and ERISA plans was more direct than the connection asserted by Plaintiffs in this case:

Accordingly in *Shaw*, for example, we had no trouble finding that New York's "Human Rights Law, which prohibited employers from structuring their employee benefit plans in a manner that discriminated on the basis of pregnancy, and New York's Disability Benefits Law, which required employers to pay employees specific benefits, clearly "relate[d] to" benefit plans." 463 U.S. at 97, 103 S.Ct. 2890. These mandates affecting coverage could have been honored only by varying the subjects of a plan's benefits whenever New York law might have applied, or by requiring every plan to provide all beneficiaries with a benefit demanded by New York law if New York law could have been said to require it for any one beneficiary. Similarly, Pennsylvania's law that prohibited "plans from ... requiring reimbursement [from the beneficiary] in the event of recovery from a third party" related to employee benefit plans within the meaning of § 514(a). *FMC Corp. v. Holliday*, 498 U.S. 52, 60, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990). The law "prohibit[ed] plans from being structured in a manner requiring reimbursement in the event of recovery from a third party" and "require[d] plan providers to calculate benefit levels in Pennsylvania based on expected liability conditions that differ from those in States that have not enacted similar antisubrogation legislation," thereby "frustrat[ing] plan administrators' continuing obligation to calculate uniform benefit levels nationwide." *Ibid.* Pennsylvania employees who recovered in negligence actions against tort-feasors would, by virtue of the state law, in effect have been entitled to benefits in excess of what plan administrators intended to

provide, and in excess of what the plan provided to employees in other States. Along the same lines, New Jersey could not prohibit plans from setting workers' compensation payments off against employees' retirement benefits or pensions, because doing so would prevent plans from using a method of calculating benefits permitted by federal law. *Alessi, supra,* at 524, 101 S.Ct. 1895.

*Travelers,* 514 U.S. at 656–67, 115 S.Ct. 1671. In each of these cases, the state law either mandated that ERISA plans use a particular benefit structure or required ERISA plans to administer claims for benefits in a particular way.[8]

The effects of H.B. 335 are much less pronounced. H.B. 335 does not forbid ERISA plans from using mail-order pharmacies to fill maintenance prescriptions, it merely restricts the ability of HMOs to do so. Not all ERISA plans use HMOs to insure against the risk that their employees will require prescription medication. Some ERISA plans use traditional indemnity insurers, while others self-insure. Thus, an ERISA plan that chose not to use an HMO could still use mail-order pharmacies to fill all maintenance prescriptions.

Although H.B. 335 is different than the statutes that warranted preemption in the Supreme Court cases described above, it is also distinguishable from the statute that was upheld in *Travelers.* That case involved a New York law that required hospitals to collect surcharges from patients covered by certain commercial indemnity insurers and HMOs, but not from patients covered by Blue Cross and Blue Shield.

*Id.* at 649, 115 S.Ct. 1671. The Supreme Court held that the surcharges would not preclude uniform administrative practice or the provision of uniform interstate benefit packages, but instead affected only the relative costs of purchasing such benefits: "It is an influence that can affect a plan's shopping decisions, but it does not affect the fact that any plan will shop for the best deal it can get, surcharges or no surcharges." *Id.* at 660, 115 S.Ct. 1671. By contrast, Plaintiffs in this case do not argue that H.B. 335 imposes undue costs on ERISA plans, but rather that the state law restricts the ability of ERISA plans to provide maintenance prescription benefits by contracting with HMOs that exclusively use mail order pharmacies for this purpose. It therefore appears that Supreme Court precedent will not provide a clear answer to whether H.B. 335 is preempted by ERISA.[9]

Plaintiffs argue that this Court should follow the Fifth Circuit's analysis in *CIGNA Healthplan of La. v. State of La. ex rel. Ieyoub,* 82 F.3d 642 (5th Cir.), *cert. Denied,* 519 U.S. 964, 117 S.Ct. 387, 136 L.Ed.2d 304 (1996). In that case, a Louisiana statute required Preferred Provider Organizations ("PPOs") to open their networks to any provider of health care services who was willing to meet certain terms, such as reimbursement rates. *Id.* at 645. The Fifth Circuit held that the statute mandated employee benefit structures or their administration. *Id.* at 648 (*citing Travelers,* 514 U.S. at 658, 115 S.Ct. 1671). The Court explained that "ERISA plans that choose to offer cover-

---

**8.** However, the *Travelers* Court also noted that "we do not hold today that ERISA preempts only direct regulation of ERISA plans." *Id.* at 667, 115 S.Ct. 1671. The Court acknowledged that "a state law might produce such acute, albeit indirect, economic effects, by intent or otherwise, as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers, and that such a law might indeed be preempted by ERISA." *Id.* Plaintiffs have specifically disclaimed the argument that H.B. 335 has such a severe economic impact on ERISA plans that it forces them to

structure benefits in a particular way. *See* Pl.'s Reply at 20 ("the question of whether H.B. 335 has an economic impact on ERISA plans is irrelevant.").

**9.** Nor is the Eighth Circuit's decision in *National Park* dispositive, because that case did not reach the "connection with" prong of the *Shaw* analysis. 154 F.3d at 825–26 ("Because the PPA is preempted under the 'reference to' prong of the ERISA preemption analysis, we find it unnecessary to reach the question of whether it is also preempted under the 'connection with' prong.").

age by PPOs are limited by the statute to using PPOs of a certain structure—i.e., a structure that includes every willing, licensed provider." *Id.* at 648. The Court also rejected the argument that the statute should not be preempted because ERISA plans could use different structures if they contracted with organizations other than PPOs, such as traditional indemnity insurers:

> Neither is it of any consequence that plans might not choose to offer coverage by PPOs: It is sufficient for preemption purposes that the statute eliminates the choice of one method of structuring benefits.... By denying insurers, employers, and PPOs the right to structure their benefits in a particular manner, the statute is effectively requiring ERISA plans to purchase benefits of a particular structure when they contract with [PPOs].

*Id.; accord Texas Pharmacy Ass'n v. Prudential Ins. Co. of Am.,* 105 F.3d 1035, 1037 (5th Cir.), *cert. denied,* 522 U.S. 820, 118 S.Ct. 75, 139 L.Ed.2d 34 (1997) (following the rule articulated in *CIGNA* ). Thus, the Fifth Circuit believed that regulations affecting the structure of benefits provided by PPOs had a sufficient connection with ERISA to warrant preemption.

The Ninth Circuit has reached a different conclusion in a case involving similar [10] facts. *Washington Physicians Serv. Ass'n v. Gregoire,* 147 F.3d 1039 (9th Cir.1998), *cert. denied,* 525 U.S. 1141, 119 S.Ct. 1033, 143 L.Ed.2d 42 (1999). In *Gregoire,* a Washington statute required HMO and health care service contractors to provide coverage for alternative treatments, such as acupuncture. *Id.* at 1042. The Court held that the statute did not impact the structure or administration of ERISA plans for the following reasons:

> In the end, what saves the [state statute] from ERISA preemption is that it does not have anything to do with employee benefit plans in particular. It is

merely one of many state laws that regulates one of many products that an employee benefit plan might choose to buy. The [state statute] regulates health insurance in a broad and neutral way, and only when that insurance is not provided by the plan itself. The mere fact that many ERISA plans choose to buy health insurance for their plan members does not cause a regulation of health insurance automatically to "relate to" an employee benefit plan—just as a plan's decision to buy an apple a day for every employee, or to offer employees a gym membership, does not cause all state regulation of apples and gyms to "relate to" employee benefit plans. After *Travelers,* ERISA plans no longer have a Midas touch that allows them to deregulate every product they choose to buy as part of their employee benefit plan.

*Id.* at 1044–45. This reasoning is consistent with the statement in *Travelers* that "[n]othing in the language of [ERISA] or the content of its passage indicates that Congress chose to displace general health care regulation, which has historically been a matter of local concern." 514 U.S. at 661, 115 S.Ct. 1671.

This Court is persuaded by the analysis in *Gregoire* that H.B. 335 does not mandate the structure or administration of ERISA plans. ERISA plans contract with a variety of providers to obtain employee benefits. For example, they employ accountants; yet surely no one would argue that state regulation of accountants would impermissibly affect the structure of ERISA plans. The alleged impact of H.B. 335 on ERISA plans is to eliminate their freedom to contract with HMOs that require enrollees to obtain maintenance prescriptions exclusively through mail-order pharmacies. This connection is quite attenuated, and too remote to warrant preemption. *See Travelers,* 514 U.S. at 655,

---

**10.** Although the Ninth Circuit case involved a Mandated Provider statute, while the Fifth Circuit case involved an Any Willing Provider statute, neither Court's analysis focused on

that distinction when determining whether the state law had a connection with ERISA plans.

115 S.Ct. 1671 ("[i]f 'relate to' were taken to extend to the furthest stretch of indeterminacy, then for all practical purposes pre-emption would never run its course, for '[r]eally, universally, relations stop nowhere.' "). H.B. 335 does not forbid ERISA plans from using mail-order pharmacies to fill maintenance prescriptions, it merely restricts the ability of HMOs to do so. Thus, an ERISA plan that wanted to require its beneficiaries to have their maintenance prescriptions filled through the mail could do so by self-insuring, or contracting with a more traditional insurer, such as an indemnity insurer. The practical effect of the statute is therefore to reduce an ERISA plan's shopping choices slightly, rather than to mandate a particular benefit structure. *See id.* at 660 (noting that regulations that merely affected the shopping choices of ERISA plans would not be preempted).

The remaining *St. Mary's* factors also indicate that H.B. 335 should not be preempted. H.B. 335 does not negate provisions of ERISA plans. More importantly, the parties agree that H.B. 335 is a health care regulation and an exercise of traditional state power. *See* Pl.'s Sugg at 38 n. 6. This factor weighs heavily in this Court's preemption analysis, given the presumption that Congress did not intend for ERISA to preempt traditional state regulations. Finally, although the statute may have some indirect economic effect on ERISA plans, Plaintiffs do not argue that the statute should be preempted for this reason. The Court therefore concludes that H.B. 335 has no prohibited connection with ERISA plans.

### B. The "Saving Clause"

■ Furthermore, even if H.B. 335 did relate to ERISA plans, it would not be preempted because of ERISA's "saving clause," which protects the traditional state authority to regulate insurance. This clause states that "nothing in [ERISA] shall be construed to exempt or relieve any person from any law of any State which regulates insurance." 29 U.S.C. § 1144(b)(2)(A). Thus, "states have

full power to prescribe the forms of contract and the terms of protection of the insured." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 743 n. 19, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). To determine whether a state law regulates insurance, courts first take a "common sense" view. *Id.* at 740, 105 S.Ct. 2380. They then apply three specific factors to determine whether the law regulates the "business of insurance," as that term is defined in the McCarran–Ferguson Act. *Id.*

### 1. Common Sense

■ Under a common sense approach, a law only regulates insurance if it is "specifically directed toward that industry." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). The saving clause contains no preference for traditional insurance; innovative insurance may also be saved from preemption. *Id.*

■ In this case, the parties disagree about what "common sense" dictates. Defendant argues that HMOs are insurance companies and that H.B.335 should be saved from preemption because it regulates HMOs. Plaintiffs counter that HMOs are not insurance companies and that regulation of contractual relationships between HMOs and pharmacies therefore cannot be regulation of insurance.

Plaintiffs again rely on the Eighth Circuit's decision in *National Park*, but that decision is not dispositive of this issue. In *National Park*, the Court held that the Arkansas PPA was not specifically directed toward the insurance industry because the legislative intent in passing the law was "to provide the opportunity of providers to participate in health benefit plans." *Id.* at 829. The Court noted that the term "health benefit plan" included far more than just insurance companies, extending to "any entity that provides reimbursement, including capitation, for health care services." *Id.* (*quoting Ark.Code Ann.* § 22–99–203(c)). This definition included

"employers and administrators of self-insured plans, as well as traditional insurance." *Id.* The Court therefore concluded that the statute "simply does not fit within the common-sense view of a law directed specifically toward the insurance industry." *Id.* (*citing Pilot Life,* 481 U.S. at 50, 107 S.Ct. 1549).

Plaintiffs read *National Park* too broadly when they assert that no statute regulates insurance if it regulates relationships between HMOs and providers of medical services. The statute at issue in *National Park* applied to any entity that provided reimbursement for health care services, not just HMOs. It is therefore unsurprising that the Eighth Circuit found that the Arkansas statute was not "specifically directed" toward the insurance industry. By contrast, Missouri's statute is limited to HMOs and does not apply to self-insured plans or indeed any other entities that provide reimbursement for health care services. Furthermore, the legislature's intent in passing H.B. 335 was to affect the contractual relationships between HMOs and pharmacies and to allow HMO members to choose whether to have their maintenance prescriptions filled by retail or mail service pharmacies. Assuming *arguendo* that HMOs are insurance companies, common sense would dictate that the Missouri statute regulates insurance, even though it also affects pharmacies.

A number of Circuit Courts have held that HMOs are indeed insurance companies, because both HMOs and indemnity insurers spread the risk of health care expenses among patients and subscriber groups over time. *See, e.g., Gregoire,* 147 F.3d at 1046; *Anderson v. Humana, Inc.,* 24 F.3d 889, 890 (7th Cir.1994); *Ocean State Physicians' Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.,* 883 F.2d 1101, 1107-08 (1st Cir.1989), *cert. denied,* 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990) (HMO "is an insurance policy which operates by spreading policyholders'

risk"), *but see Texas Pharmacy Ass'n,* 105 F.3d at 1038 (noting that HMOs are not insurance companies). In *Gregoire,* a Washington statute required HMOs and health care service contractors to provide coverage for alternative treatments such as acupuncture. *Id.* at 1042. The statute did not require HMOs to contract with particular providers, but merely prohibited HMOs from excluding "an entire category of licensed providers (e.g., all chiropractors or all naturopaths) from its policy." *Id.* Taking a common sense view, the *Gregoire* court concluded that HMOs were insurance companies:

> The only distinction between an HMO ... and a traditional insurer is that the HMO provides medical services directly, while a traditional insurer does so indirectly by paying for the service, but this is a distinction without a difference. In the end, HMOs function the same way as a traditional health insurer: The policyholder pays a fee for a promise of medical services in the event that he should need them. It follows that HMOs ... are in the business of insurance.

*Id.* at 1045–46 (citations omitted).[11]

"The primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk." *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 211, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985). HMOs in Missouri do just that. Rates for health care provided by HMOs are both calculated by actuarial analysis, and the risk that the cost of health care benefits will exceed prepaid revenues is essentially the same for an HMO as for an indemnity insurer. Further, HMOs in Missouri have been subject to similar regulation by the Missouri Department of Insurance as that applied to indemnity insurance companies. This Court is therefore persuaded by the

---

11. Notably, the Eighth Circuit in *National Park* distinguished *Gregoire* on the grounds that the Washington statute was directed specifically toward HMOs, while the Arkansas statute was not limited to insurance companies. 154 F.3d at 829.

Ninth Circuit's holding that HMOs are insurance companies for purposes of ERISA preemption analysis. "Common sense" dictates that regulation of contracts between insurance companies and providers is regulation of insurance. *See Metropolitan Life,* 471 U.S. at 741, 105 S.Ct. 2380 (noting that ERISA does not preempt public health legislation that accomplishes its ends through insurance regulation).

## 2. The Three–Factor Test

The Court must also consider three McCarran–Ferguson factors to determine whether the Missouri law regulates the business of insurance: "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." *Id.* at 743, 105 S.Ct. 2380. These factors are merely "considerations to be weighed," and none is "necessarily determinative in itself." *UNUM Life Ins. Co. of Am. v. Ward,* 526 U.S. 358, 373, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999) (*quoting Pilot Life,* 481 U.S. at 49, 107 S.Ct. 1549 and *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982)).

The proper application of the McCarran–Ferguson factors is not a matter of first impression. The Supreme Court and several Circuits have applied these factors to various regulations that have been imposed on insurance companies, and they have reached similar conclusions. In general, statutes that can be categorized as "Mandated Benefit" or "Mandated Provider" laws are found to regulate the business of insurance. *Metropolitan Life,* 471 U.S. at 743, 105 S.Ct. 2380 (Mandated Benefit); *Gregoire,* 147 F.3d at 1047 (Mandated Provider). By contrast, "Any Willing Provider" laws often fail the three factor test. *Nat'l Parks,* 154 F.3d at 829–30; *see also CIG-NA Healthplan of La., Inc.,* 82 F.3d at 650 (finding that Any Willing Provider

law failed McCarran–Ferguson test because it was not limited to entities within the insurance industry, but also regulated other entities such as Taft–Hartley trusts and self-funded plans). The three types of statutes may be briefly described as follows: (1) Mandated Benefit statutes require insurance companies to pay for certain benefits, such as mental health treatment, *see Metropolitan Life,* 471 U.S. at 727, 105 S.Ct. 2380; (2) Mandated Provider statutes require insurance companies to pay for treatment by certain types of providers, such as chiropractors, *see Gregoire,* 147 F.3d at 1042; and (3) Any Willing Provider statutes require insurers to pay for treatment by any health care provider who is willing to meet the terms and conditions required of other participating providers.

In *Metropolitan Life,* a Mandated Benefit statute required insurance companies to provide mental health care benefits. 471 U.S. at 727, 105 S.Ct. 2380. The Supreme Court held that the law met all three of the McCarran–Ferguson factors:

[The statute] obviously regulates the spreading of risk: as we have indicated, it was intended to effectuate the legislative judgment that the risk of mental-health care should be shared.... It is also evident that mandated-benefit laws directly regulate an integral part of the relationship between the insurer and the policyholder by limiting the type of insurance that an insurer may sell to the policyholder. Finally, the third criterion is present here, for mandated-benefit statutes impose requirements only on insurers, with the intent of affecting the relationship between the insurer and the policyholder.

*Id.* at 743, 105 S.Ct. 2380. Similarly, in *Gregoire,* a Mandated Provider statute required insurance companies to provide coverage for certain types of treatment, such as care by chiropractors. 147 F.3d at 1042. The Ninth Circuit concluded that the statute spread the risk that insured would need such treatment, conferred a

benefit on insureds, and regulated only insurance companies. *Id.* at 1047.

In *National Park,* an Any Willing Provider statute required insurance companies and other entities to allow any health care provider who was willing to accept certain terms, such as reimbursement rates, to provide medical treatment to insureds. 154 F.3d at 816. The statute was designed to allow patients to choose their health care providers. *Id.* at 815–16. The Eighth Circuit held that the Any Willing Provider statute met none of the McCarran–Ferguson Factors. *Id.* at 829–30. Arkansas conceded that the statute did not spread or transfer risk, and the Court held that the statute "plainly" did not have that effect. *Id.* at 830. Further, the Eighth Circuit held that the statute only defined "the terms of the relationship between the insurer and a third party," and therefore had only an attenuated connection to the insurer-insured relationship. *Id.* at 829–30. The Court contrasted this with the mandated provider law at issue in *Gregoire,* noting that Mandated Provider statutes confer benefits on insureds "by expanding the treatments that their health carriers must pay for." *Id.* at 830 (*quoting Gregoire,* 147 F.3d at 1046–47). Any Willing Provider laws, by contrast, "only require a health carrier to allow an insured to see any doctor willing to abide by the terms of the insurance plan." *Id.* (*quoting Gregoire,* 147 F.3d at 1046–47). Turning to the third factor, the Court held that the state statute was not limited to entities within the insurance industry, because it applied to all "health benefit plans," including entities that could not be classified as insurance companies. *Id.*

H.B. 335 is akin to a Mandated Provider or Mandated Benefit statute rather than an Any Willing Provider statute. H.B. 335 requires HMOs to allow a particular kind of provider, namely retail pharmacies, to provide health benefits if those pharmacies are within the HMO's network. What the statute in *Gregoire* did for chiropractors, H.B. 335 does for retail pharmacies.[12] Namely, H.B. 335 forbids HMOs from discriminating against retail pharmacies *as a class.* H.B. 335 does not require HMOs to open their networks to *any* retail pharmacy willing to meet its terms, and it therefore cannot be labeled an Any Willing Provider statute.

Plaintiffs argue that Missouri's statute should not be classified as a Mandated Provider statute because retail pharmacies are essentially the same as mail order pharmacies: "A pharmacy is a pharmacy is a pharmacy." [Pl.'s Surreply at 9]. They assert that the distinction between these two types of pharmacies is less important than the distinction between, for example, physicians and chiropractors. There is a difference in kind between retail and mail order pharmacies, however, as demonstrated by the affidavits from pharmacists submitted by Defendant. For example, George Oestreich, a licensed pharmacist in the State of Missouri, made the following sworn statement:

> Maintenance prescriptions are generally prescribed for medications that treat chronic conditions, such as high blood pressure. Patients receiving maintenance prescriptions usually must take their medication every day without interruption. Thus, these patients must have a supply of their prescriptions at

12. One distinction should be noted, however. The statute in *Gregoire* required insurance companies to include certain kinds of providers in their networks. For example, every insurance company was required to include a chiropractor in its network. 147 F.3d at 1042–43. Missouri's statute, by contrast, does not require HMOs to include retail pharmacies in their networks. Hypothetically, therefore, an HMO could exclude retail pharmacies from its network entirely and avoid the requirements of H.B. 335 Plaintiffs' facts

indicated, however, that HMOs that provide pharmacy benefits include retail pharmacies in their networks to supply prescriptions of 30 days or less, and only use mail order pharmacies to fill maintenance prescriptions. [Pl.'s Sugg at 9–10; Declaration of Jennifer Goldberg Low at ¶ 27]. Given these facts, Missouri's statute functions as a Mandated Provider statute, by requiring HMOs to allow enrollees to receive any of their prescriptions from retail pharmacies if those pharmacies are already in the HMO network.

all times. If patients must obtain their medication through mail ·order pharmacies, this places a burden on the patient to always remember to send their prescription request in at the appropriate time. ·

Def.'s Ex. 6 at 2. Oestreich also testified that customers obtaining maintenance prescriptions from a retail pharmacist had the opportunity to consult with the pharmacist in person, while customers obtaining such prescriptions through the mail could only speak "with a strange pharmacist through a toll-free number." *Id.* at 3. Thus, it appears that the opportunity to use a retail pharmacy is of benefit to at least some patients, and that retail pharmacies are different in kind from mail-order pharmacies. Therefore, Missouri's statute confers a benefit upon enrollees of HMO's and requires HMO's not to discriminate against a distinct category of providers, namely retail pharmacies. It is therefore akin to Mandated Benefit and Mandated Provider statutes, and is not an Any Willing Provider statute.

Turning to the specific McCarran–Ferguson factors, the Court concludes that all three of these factors support a finding that Missouri's law regulates insurance. First, H.B. 335 transfers risk from enrollees to HMOs and spreads enrollees' risk to their HMO insurers. Specifically, the state law spreads and transfers the risk that enrollees will need to have their maintenance prescriptions filled by local pharmacies. Consider a hypothetical case in which an enrollee with hypertension accidentally lost her bottle of high blood pressure medication. Assume further that the enrollee needed to take the medication every day. In such an instance, the enrollee would need to obtain at least a short-term refill at a retail pharmacy, because a mail order pharmacy could not deliver a refill that day. Before H.B. 335, the enrollee could be forced to pay a higher copayment or deductible for using the retail pharmacy, even if that pharmacy provided prescriptions at the same cost to the HMO as a mail order pharmacy. H.B. 335 prohibits that practice. Further, even if the

retail pharmacy did not meet the HMO's price cost determination, the HMO would still be required to allow the retail pharmacy to fill the prescription (but could charge a higher copayment or deductible). These requirements transfer ·the risk that an enrollee will need to have a maintenance prescription filled at a retail pharmacy from the enrollee to the HMO. They also spread that risk among all enrollees. *See Blue Cross and Blue Shield of Kansas City v. Bell,* 798 F.2d 1331, 1335 (10th Cir.1986) ("[T]he insured's right to choose the type of practitioner to fulfill the agreed upon coverage must figure into, and play a part in, the spreading and underwriting of a policyholder's risk."); *accord Gregoire,* 147 F.3d at 1046 (Mandated Benefit statute spread risk that insured would need alternative treatment).

Plaintiffs argue that H.B. 335 does not transfer risk because it merely affects contractual arrangements between HMOs and pharmacies. The Supreme Court has held that arrangements between insurers and pharmacies, which serve only to minimize the costs that the insurer incurs in filling prescriptions, do not spread or transfer risk. *Group Life & Health Ins. Co.,* 440 U.S. at 213–14, 99 S.Ct. 1067 (reaching this conclusion). In *Group Life & Health Insurance Company,* the Supreme Court addressed whether · a contractual arrangement between an insurance company and several retail pharmacies constituted the "business of insurance," as that term is defined in the McCarran–Ferguson Act. *Id.* at 209, 99 S.Ct. 1067. Several pharmacies had agreed to fill prescriptions for the insurance company's clients if they were reimbursed for the cost of the drug plus a $2.00 payment by the customer. *Id.* The Supreme Court concluded that the contracts did not spread or transfer risk, because the arrangement merely served to minimize the insurance company's costs. *Id.* at 213–14. The Court further noted that "policyholders are basically unconcerned with arrangements made between Blue Shield and participating pharmacies." *Id.* By contrast, in this case, an HMO's contractual arrangements with mail order

and retail pharmacies can have a profound effect on enrollees. If an HMO decided to use only mail order pharmacies to fill maintenance prescriptions, then enrollees who needed such drugs immediately would be faced with a choice between paying for the drugs themselves or going without them for some time. The Supreme Court's decision is therefore not controlling in this case.

Plaintiffs also rely on the Eighth Circuit's holding in *National Park* that Arkansas's Any Willing Provider statute did not spread risk. That holding is distinguishable because H.B. 335 is a Mandated Provider statute. Any Willing Provider statutes, such as the Arkansas PPA, do not require insurance companies to cover different kinds of services. Instead, they only require insurance companies to allow a greater number of providers to offer these services to insureds. For example, consider an insured who needs to visit a general practitioner because he has the flu. In the absence of an Any Willing Provider statute, the insurance company might only provide coverage for the office visit if the insured goes to one of a limited number of general practitioners. If an Any Willing Provider statute were in place, then the insurance company would be required to provide coverage for the office visit if the insured went to any general practitioner who met the insurance company's terms. The Any Willing Provider statute would therefore have the likely effect of increasing the number of general practitioners from whom the insured could choose. However, even without the statute, the insured would be able to see a general practitioner in the insurance company's network. Thus, in either case, the risk that the insured will need to see a general practitioner is borne by the insurance company. This is why Any Willing Provider statutes do not spread risk. By contrast, as explained earlier, Missouri's Mandated Provider statute requires HMOs to bear the risk that enrollees will need to use a retail pharmacy to meet an acute need, that otherwise would be borne by the enrollee.

Second, H.B. 335 regulates an integral part of the policy relationship between HMOs and their enrollees. Unlike the statutes at issue in *Royal Drug* and *National Park,* H.B. 335 affects the ability of enrollees to obtain health care services from a class of providers. H.B. 335 requires HMOs to allow their enrollees to choose between mail order and retail pharmacies. By regulating contracts between HMOs and pharmacies, H.B. 335 thus affects the policy relationship between HMOs and their enrollees. Like the statute in *Gregoire,* Missouri's law therefore confers a benefit on enrollees by expanding the kinds of services (retail versus mail order pharmacy services) that HMOs must fund. *See Nat'l Parks,* 154 F.3d at 830 (distinguishing *Gregoire* for this reason). The statute therefore "change[d] the bargain between insurer and insured." *UNUM,* 526 U.S. at 358, 119 S.Ct. 1380. Indeed, the Missouri legislature intended this result when it passed the statute.

Finally, H.B. 335 only regulates entities within the insurance industry. The plain language of H.B. 335 indicates that the statute only regulates the activities of HMOs: "Every health maintenance organization shall apply the same coinsurance, copayment and deductible factors to all drug prescriptions filled by a pharmacy provider who participates in the health maintenance organization's network if the provider meets the contract's explicit product cost determination." Mo.Rev.Stat. § 354.335.3. The statute also states that "health maintenance organizations shall not set a limit on the quantity of drugs which an enrollee may obtain at any one time with a prescription, unless such limit is applied uniformly to all pharmacy providers in the health maintenance organization's network." Mo.Rev.Stat. § 354.335.4. Because the statute regulates only HMOs, and because HMOs are insurance companies, it follows that the statute regulates only insurance companies.

Plaintiffs assert that H.B. 335 also regulates pharmacies, because the statute was passed in part to "level the playing field" between retail and mail order pharmacies.

It is undisputed that the law affects pharmacies, but the law cannot be said to regulate pharmacies. The verb "to regulate" means "[t]o control or direct in agreement with a rule." WEBSTER'S II NEW COLLEGE DICTIONARY 934 (1986). H.B. 335 does not control or direct pharmacies in any way. It would be impossible for a pharmacy to violate the statute. H.B. 335 only directs the activity of HMOs, and the statute's effect on pharmacies therefore cannot be classified as regulation. *See Blue Cross & Blue Shield of Kansas City,* 798 F.2d at 1334 (finding that Mandated Provider statute was limited to the insurance industry).

In sum, H.B. 335 does not "relate to" ERISA plans, and it constitutes permissible state regulation of insurance. For these reasons, it is not preempted.

Accordingly, it is hereby ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. # 33) is DENIED.

It is further ORDERED that Defendant's Cross–Motion for Summary Judgment (Doc. # 45) is GRANTED.